# Exhibit S



# When 'he'll be kept on payroll, somewhere' is where you are

Henry de Valence  Follow
Mar 16, 2017 · 17 min read



On August 31, 2015, I started a Ph.D. in cryptography at TU Eindhoven, working with Tanja Lange and Dan Bernstein. On December 2, 2016, I resigned, due to sexual harassment, bullying, blackmail, and physical harm as a result of their favorite student, Jacob Appelbaum, as well as Tanja and Dan's total abdication of their responsibility to manage the workplace environment in their research group.

Last June, Lex Gill wrote "not specifically about the situation at hand, but about every time this happens":

> The pitch of these statements is always the same. People will feel discomfort in their hearts but they will retreat anyway. It could be true. That is the point of the genre. He's taking some space.
>
> The people that matter will be spoken to, quietly. They will tell others how it's "destroying him," how he's suffered enough. It's "complicated," but they're not at liberty to discuss. He'll be kept on payroll, somewhere.

The thing is, there's always someone for whom "somewhere" is where they are. This is the story of why I felt no option but to leave, and why I feel that I have no option now but to speak about what happened.

I first heard of Jacob's inappropriate behaviour in December of 2015, while in Berlin after the CCC. A close friend contacted me, telling that Jacob had grabbed her, that he had told her to "just go with it" when she told him to stop, that he had repeatedly violated her boundaries, and that she wanted me to help watch out that he did not have an opportunity to violate them further. I took her concerns extremely seriously, both because I trust her judgement, and because I had observed numerous red flags from Jacob over the preceding four months, including an incident at the September 2015 Tor meeting, when he told me that Tor's code of conduct was an effort by "radical feminists", which was unnecessary as "rape is not a problem in our community". (Tor's subsequent internal investigation would seem to disagree with his assessment.)

In the fall of 2015, I worked as a TA grading homework for a cryptography course Tanja taught at Eindhoven. In January 2016, after missing the lectures for the course, Jacob returned to the university to write the exam. He spent a week in Tanja and Dan's apartment, completing the homework with the assistance of a masters' student, whom he would later buy a return flight to Japan.

During this period, Jacob continued his pattern of inappropriate behaviour, showing me sexually explicit text messages he had received, with neither my consent nor, presumably, the consent of the person who sent them to him.

After he wrote the exam, Tanja asked me to grade Jacob's homeworks, informing me that his homework grade "really did matter", and allowed

informing me that his homework grade "really did matter", and allowed Jacob to tell me in her presence that I needed to grade his homeworks favourably. Of course, all of the other students in the class were required to submit their assignments on time, to be graded together according to a standard rubric.

This incident is an example of how, for Tanja and Dan, rules and process are for other people, not for Jacob. Jacob is exceptional. He was not required to complete the homework for his required courses on time. He was given special treatment with respect to grading. He was invited to give talks with little-to-no content, which would be rejected if they were given by anyone else. He was not expected to regularly show up for work or for his courses (from mid-January to August, I saw him at the university once, when he appeared for the group outing of the Discrete Math section).

In February, while the group was planning travel to Japan for the PQCrypto conference, Tanja asked me to share an AirBNB with Jacob. Though I was not comfortable having to spend time with Jacob, I did not feel comfortable declining, since the rest of the group's accommodations were already booked. By this time, a number of Jacob's victims within the Tor community had begun to discuss how to deal with his behaviour, as described in my partner Isis Lovecruft's account of events.

Jacob learned of a plan to help him correct his behaviour at the next Tor meeting (in Valencia, immediately following the PQCrypto conference). His response was to threaten retaliation, as described in Isis's account; he was then disinvited from attending the Tor meeting.

At the conference, Jacob used his opportunity to interrogate me for nearly two hours in the AirBNB, attempting to learn as much as possible about what I knew, whether I had been involved in that plan (no), what I knew about his victims, about who knew what, about how unfair it was that everyone was just trying to take out their personal problems on him, and describing to me at length efforts he had taken to undermine those who had challenged him on his behaviour before.

He specifically told me he was prepared to "dig up shit" on people who spoke out against him. Immediately after blackmailing me, Jacob told me not to tell any of the other students in the research group that he had been disinvited from the Tor meeting.

On the last day of the Japan trip, I returned to the AirBNB and stayed upstairs by myself, in an attempt to take some time alone before I would have to be stuck with Jacob for the 16-hour trip back to Europe. Jacob came upstairs with a bottle of irritant eye drops, supposedly containing menthol, and pushed me to let him put them in my eyes. I said no, three times, before deciding that, because Jacob thrives on provoking negative reactions from others, it would be best to "go along to get along" until I would no longer have to deal with him. My right eye, into which Jacob placed an irritant eye drop, has never really felt the same since then; for months afterward it was continually slightly irritated, often watering, and I would get headaches localized to my right temple.

Some time later, when I told this story to another person in Tor, they responded by telling me about an incident they witnessed at a Tor meeting in Seattle, in which Jacob allegedly tried to use a dropper to dose people with hash oil and LSD. I wasn't there, so there's no way for me to know with certainty what really happened, but it's disturbing to tell the story of what happened to you and hear the same specificities of abusive behaviour echoed back. To start to understand how a story is like a password.

Of course, in retrospect, it was a mistake to give in to Jacob's pressure. But, before doing a PhD at Eindhoven, I never had to worry whether my co-worker was trying to induce blindness or psychosis. I've learned a lot since last fall.

In the taxi to the airport and on the airplane, Jacob continued his

inappropriate, boundary-violating behaviour, loudly describing to me (and the entire airplane) how at a previous job (at Kink.com) he had "fucked a woman with a converted Sawzall", before asking "have you ever seen a woman squirt?", and adding "This is not a work conversation, by the way" as if that were some kind of magical incantation that would make his behaviour appropriate.

I continued to say nothing, as I had done for the past hour, so as not to encourage him with a reaction. Jacob also told me a story that he was fired from Kink.com because he tried to unionize their employees. At the time, I found this story implausible in view of Jacob's track record compared to the amount of work required to organize a union. Later, I would be unsurprised to read Violet Blue's allegation that the real reason for his departure involved sexual harassment.

From this point on, I avoided contact with Jacob. I first raised concerns about Jacob's behaviour with Tanja on Sunday, 24 April. While visiting Tanja and Dan's apartment, I told Tanja that I did not want to interact with Jacob, and told her that he had behaved inappropriately towards a close friend. I did not mention Jacob's sexual harassment or threatening behaviour towards me, both because I naïvely thought that Tanja would take my concerns seriously that this reason would be enough to avoid having to deal with Jacob and because Tanja's reaction did not inspire confidence that she would believe my experiences.

Tanja said that she had heard from Roger Dingledine that complaints about Jacob within Tor were "just" about bullying, not a "sex thing", and seemed to view my request to avoid contact with Jacob as a request to intervene in a personal dispute between Jacob and myself. Worried that this was just my failure to communicate, I asked another academic I trusted to talk to Tanja. He would later tell me that "I have never found it so difficult to talk to Tanja", and that "when you talked to her, she did not understand; when I talked to her, she understood and did not believe it."

The next week, I spoke to Dan for nearly two hours, describing Jacob's behaviour. Specifically, I told Dan that I was contacted by a close friend whose boundaries Jacob violated, about Jacob's conduct in the AirBNB, including that he made threatening statements, about the damage he caused to my eye, that he had repeatedly behaved inappropriately to me, and that he had threatened retaliation against my partner. Dan's suggestion on hearing that Jacob caused me physical harm was to suggest that Jacob and I should have an unspecified "mediation process".

When I asked Dan to be separated from Jacob so I would not have to interact with him, he told me that while this might be possible in the short term, in the long term it seemed to be an unworkable solution.

The Tor Project announced the reasons for Jacob's departure during a summer school on cryptography in Croatia. At the same time, an anonymous group posted their stories of Jacob's abuse online.

On June 4, Dan sent an email to the entire research group. Dan informed the group that the only appropriate venue for dealing with Jacob's behaviour is the criminal justice system and that he felt it would be inappropriate for him to take any action before the outcome of a court case.

He took the time to emphasize the need to punish "false accusations", which occur "often" (in reality, between 2% and 8% of the time), and described only two outcomes: a "true" accusation, leading to jail for the accused (in reality, 6 of every 1000 perpetrators are jailed in the United States), or a "false" accusation, leading to punishment for the complainant. According to Dan's mail, there is no possibility beyond "punish the accused" or "punish the accuser", or any level of inappropriate conduct below that which is strictly illegal: for instance, Dan did not mention the plagiarism alleged in the tweets he referenced in his own email.

When Dan sent this mail, he had already received reports from multiple

people that Jacob's abusive behaviour was not limited to Tor, but also extended into his research group — and I suspect that he knew even more, since Jacob was staying at Dan and Tanja's apartment at the time that he was attempting to negotiate his exit from the Tor Project.

When Dan wrote that dealing with Jacob is a job for the courts, and not for Dan, he did so knowing that Jacob's abuse was not limited to a single person and also affected one of his students. I asked Dan to isolate me from Jacob; he wrote that we should all wait, presumably for several years, "for judges and juries to do their jobs" before taking action. I told Dan that Jacob had blackmailed me and my partner; he wrote about the need to punish those who are unsuccessful in raising complaints with the court system. I do not believe this was an accident.

On Monday, June 6, Tanja interrogated me about Jacob for nearly two hours. The word "interrogated" is Tanja's description, not mine: after describing her understanding of Jacob's conduct in Japan ("interrogating you in the AirBNB"), and noticing that I was uncomfortable with her questions, she apologized that "she was now doing an interrogation herself".

About two years before these events, I had signed an anti-harassment statement published by the Tor Project around the time of Gamergate. On May 26, I had spoken privately to Roger Dingledine at the Security in Times of Surveillance meeting at Eindhoven, and told him that I felt uncomfortable having my name together with Jacob's on that statement. When I had asked how it could be removed, he had suggested I ask someone with edit access to make the change. I had then privately asked a Tor community member, who was later asked to leave Tor, to make the change, and informed no-one else, planning to comment later.

Tanja told me during her "interrogation" that she had "noticed" that my name was missing from the two-year old anti-harassment statement while browsing the Tor blog, and wanted to know whether I had unsigned it in order to participate in "a harassment campaign against Jake". (No). I found this question curious and disturbing, especially in light of Jacob's earlier threats. The idea that Tanja was spending her time casually browsing years-old archives on the Tor blog and idly scanning through a list of several hundred names is utterly implausible.

After some time, Isis came to find me, since I had been missing for some time. Tanja then proceeded to discuss allegations against Jacob, expressing personal sympathy for how hard it must be for him at this time, contrasting allegations against Jacob with her knowledge of a case of "real rape", mentioning that Jacob had "so many groupies", etc. Tanja also reiterated Dan's focus on punishment for those who come forward and are not believed. Isis told Tanja their story of being raped by Jacob, without identifying it as theirs. Tanja's response was to ask "Why were they in the same bed with Jake?", and when I asked Tanja whether, if someone she knew personally came to her with this story, she would believe them. Tanja said no, not without hearing Jake's explanation. At this point myself and Isis left in tears, ending the conversation. Dan watched us leave. The next day, I told Dan I did not see a way to continue at Eindhoven, and avoided contact for the rest of the summer school.

The following week, I spoke to Dan, telling him that I found Tanja's reaction unacceptable, that I feared retaliation from Jacob, that my conclusion from Tanja's comments was that she would never believe a complaint from me about Jacob's behaviour, and that I felt unsafe at the university. On my return to the Netherlands, I spoke to Tanja and told her that I did not see a way that I could continue in my workplace, unless she took action. By this time, both Isis and Alison Macrina had attached their names to their stories about Jacob, and Leigh Honeywell, Nick Farr, and Violet Blue had also come forward with their experiences of Jacob's behaviour. Tanja acknowledged she had read Isis's account and asked me to wait a month before making any decision, so that she and Dan would have time to deal with the situation.

The day that Isis published their account, Dan cut off communication with me, announcing the end of our conversation, claiming first that he believed I had been "inaccurately summarizing" the conversation to others, and then that he realized I expected that he take some action, which would require "different procedures". Dan instructed me to "follow proper procedures", and instructed me to communicate with him only over email with no reference to any previous conversation, effectively helping him to pretend that I had not already been discussing these issues both with him and with Tanja for several weeks.

3. Dan has written at some length about the importance of "due process", both internally to the research group and externally to the world. But it's telling to notice that in every such discussion, Dan carefully avoided any mention of concrete processes: he did not define the "different procedures" suddenly required for him to take action, nor what "proper procedures" should be followed. He made vague references to "mediation" when I report physical harm, but never suggested any particular person or office to contact.

For all his interest in "due process", he never provided any information on the university's processes, nor suggested contacting particular people at the university, such as HR or a confidential advisor, nor referred to the university's guidelines on acceptable conduct. (Similarly, Tanja did not do any of these things or take any proactive measures to attempt to resolve the situation).

Dan's actions lead me to conclude that this is because Dan's interest in "due process" does not extend so far as proactively carrying any out. Instead, I believe his interest is in obfuscating to protect Jacob, while pretending to have met his responsibilities to address the issue.

3. For the next six weeks (until mid-July), I concentrated on finishing my part of our research project, and on ensuring that I had an alternate means to reside in the EU, as my visa was tied to my job. Over the following two weeks, prior to a scheduled trip to attend a summer school in Vietnam, I repeatedly reminded Tanja of the issue and asked to speak with her about what actions she had taken, and got no response.

Only after I had left did Dan contact me again, asking why I had not followed the "procedures" he had invented. On my return, with an alternate way to stay in the EU secured, I prepared a written complaint and sent it to our department secretary on the 22nd of August, since I had no idea who the HR contact person was and neither Dan nor Tanja had ever mentioned that information, since HR was not, apparently, to be involved with "proper procedures".

3. In reply to Dan's query, I asked Dan when, in his capacity as a UIC faculty member, he had last received Title IX training, since I was, and am, surprised by the vast gulf between his idea of standard procedures for handling reports of sexual harassment and the actual procedures at an institution he has been employed by for two decades. For instance, UIC requires its employees to report sexual harassment when they learn of it — retroactively claiming that conversations were "strictly confidential" is not a part of their standard procedures.

He did not answer my question, and instead wrote a long email in which he provided further detail on his "procedures", attacked my credibility, and mentioned that "procedurally improper behaviour" could lead to termination. He also emailed me to advise me to work from home, since Jacob would be at the university for a week at the end of August.

On its way to HR, my complaint was read by another faculty member. In marked contrast to Tanja and Dan's reaction, this person immediately provided me with links to university policies and contact information for the department's "vertrouwenspersoon". It was only at this time that I learned of this position, whose job it is to assist students who have problems with their advisors, and whose existence was for some reason not mentioned by either Tanja or Dan. (Actual assistance from this person was

limited, though, as they were about to go on six weeks' leave).

At the beginning of September, I spoke to two people in HR for nearly two hours, answering their follow-up questions about the complaint I had sent them. At this time I inquired about the possibility of continuing my Ph.D. at Eindhoven with a different supervisor.

One of the HR representatives at the meeting then contacted me on the 5th of September to say that the departmental board would take action on my email, and that "they [the DB] are going to plan a meeting with Dan and Tanja in which they will be informed about the complaints you have. Do you agree with this action?". I replied, "Sure. Thanks for letting me know about these developments."

I was also referred to an advisor outside of the department, and described the entire story to them. This advisor informed me of the existence of a separate "complaints commission", and I shared my view that if my department was unwilling to act, I didn't see a future at the university and would rather move on with my life.

In the second week of September, after twelve weeks of inaction, Tanja suddenly decided that this situation needed to be dealt with urgently, and suggested that I had been "avoiding her", since she was too busy to talk to me in my office. Tanja also suggested that my "avoiding her" made it impossible for her to do research supervision. In fact I had been posting regular updates and discussing it in the research project's group chat, which she had not been participating in. Somehow this became my fault.

Tanja summoned me to an HR rep's office on five minutes' notice and suggested that we sign documents to enter arbitration. I attended the meeting, but declined to sign anything, on the general principle that I don't sign documents on five minutes' notice without review by a lawyer.

When I pointed out that this situation had existed for twelve weeks already, and that I did not understand why it was suddenly an urgent matter, Tanja said that she had thought that I was quitting — as if sexual harassment, bullying, and blackmail suddenly stop being an issue when they become so bad that the victim feels that they have no option but to leave.

During this meeting, the HR rep, who seemed taken somewhat by surprise by the whole thing, made repeated references to "a topic for another meeting" whenever the conversation steered towards matters related to my complaint. I assumed this meant that he (or someone else in HR) would be following up on my complaint.

At the end of September, I left the Netherlands for a week-long project meeting in Belgium, and gave a talk on my work. I then spent a week at the Tor meeting in Seattle, took a week of leave in Canada, and visited Waterloo, where I was invited to give essentially the same talk. I returned to the Netherlands in mid-October.

While in North America, an HR rep contacted me to tell me that I needed to personally meet with yet another person at the university, who is in charge of scientific integrity. I sent this person a copy of the same written complaint I had already sent to HR, and arranged a meeting. He suggested that although there was an issue of scientific integrity in the complaint I forwarded to him, it seemed like there was a broader HR issue, and he referred me back to the same HR department that had referred me to him in the first place. I thanked him for his time and left. I would say this is probably the point at which I lost faith in the university's ability to deal with the situation.

I informed HR that I was having panic attacks about my workplace and would be working on other research projects from home while they dealt with the situation. I would later learn that HR reported to Tanja that I was "ill" at this time. In mid-November, HR informed me that I needed to undergo a mandatory mental health evaluation with the "company doctor".

I found it deeply offensive to demand this after their failure to act on my complaint, and declined.

I wrote a resignation letter addressed to the dean at the end of November, and sent it to HR. The dean informed me that until then, he "had not been allowed" to share my complaint with Tanja, and asked for permission to do so at a review meeting. I told him that nobody in HR had asked me for permission until then, and that I did not object.

On the following Saturday, Dan tweeted "Is @TUeindhoven really refusing to follow through on a contractually guaranteed salary increase? Stunned. Looking for a good Dutch lawyer." The same day, he sent an email to a Ph.D. student at Waterloo, placing Alfred Menezes in CC, noting that he had previously described my situation to Alfred as "pathetic", and asked the student to search through any UWaterloo computers for a copy of the slides I'd used there months ago.

The mid-term review meeting for the project I was hired to work on took place in January. I was told that Dan reported to the other Ph.D. students that I had called in sick in October and resigned in December, and that if any of the other fellows knew more, he would like to know.

When I informed the project reviewer and the other fellows that, in fact, I had resigned due to sexual harassment, Dan sent a response which opened with a long, irrelevant, and inaccurate story about how my work was low-quality, my research contribution was minor, etc., and claimed variously that I was "wildly exaggerating", that "there wasn't any reason to mention HR", that it was "inaccurate" to say that Jacob was fired from Tor, and that he had spent a lot of time finding research tasks "at the right level" for me.

The project reviewer, Bart Preneel, told me that KU Leuven took this complaint "very seriously" and that they would follow up on it. I have not heard any update since then. I am tired of waiting. I am tired of saying nothing. I signed up to do a Ph.D. so that I could do cryptography research, not so that I could spend months trying to blow the whistle in the face of personal and institutional resistance, and I do not intend to waste much more of my life on it.

486 claps



WRITTEN BY

**Henry de Valence**

Follow

interested in zero-knowledge, privacy, freedom, mathematics, & the number 24

See responses (11)

---

**More From Medium**



Related reads

**Why not Harberger tax?**

Dean Eigenmann in The…
Nov 22, 2018 · 4 min read    616

Related reads

**Rewriting History: A Brief Introduction to Long Range Attacks**

Evangelos…
May 31, 2018 · 15 min read   1.4K

Related reads

**User On-boarding and CREATE2**

James Young in…
Dec 19, 2018 · 5 min read    780