1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                        NORTHERN DISTRICT OF CALIFORNIA

9

10      PETER TODD,                                Case No.  19-cv-01751-DMR

11                   Plaintiff,

12             v.                                   **ORDER ON DEFENDANT'S SPECIAL
                                                   MOTION TO STRIKE**
13      ISIS AGORA LOVECRUFT,
                                                   Re: Dkt. No. 20
14                   Defendant.

15           On April 3, 2019, Plaintiff Peter Todd filed a complaint asserting diversity jurisdiction and

16   alleging a state law claim for defamation against Defendant Isis Agora Lovecruft.[1]  [Docket No. 1

17   ("Compl.").]  On July 15, 2019, Lovecruft filed this motion to strike the complaint pursuant to

18   California's anti-SLAPP statute, California Code of Civil Procedure § 425.16 *et seq*.  [Docket Nos.

19   20 ("Mot."), 31 ("Reply").]  Todd timely opposed.  [Docket No. 23 ("Opp.").]  The court heard oral

20   argument.  Following the hearing, the court ordered supplemental briefing, which the parties filed

21   on September 12, 2019 and September 19, 2019.  [Docket Nos. 49-52.]  Having considered the

22   parties' briefing and submissions, Lovecruft's motion is granted in part and denied in part.

23   **I.      BACKGROUND**

24       **A.      The Parties**

25           The following facts are taken from the record.  Where indicated, the court cites allegations

26   in the complaint to provide background information.  Todd is a developer of cryptocurrency and

27   _____

28   [1] As reflected in this order, Lovecruft uses "they/them/their" pronouns.  [Docket No. 20-3,
Declaration of Isis Lovecruft in Support of Motion to Strike ("Lovecruft Decl.") ¶ 1.]

United States District Court
Northern District of California

blockchain software.  Compl. ¶ 15; Docket No. 24, Declaration of Peter Todd in Opposition to Motion to Strike ("Todd Decl.") ¶ 2.  He also works as an applied cryptography consultant.  Compl. ¶ 1.  Todd regularly speaks at conferences around the world regarding his work in cryptography.  *Id.* ¶¶ 1, 17.  He has a large online following, and regularly posts to his account on Twitter under the handle @peterktodd.  *Id.* ¶ 19.  Todd avers that he is "highly-regarded in the cryptography and cryptocurrency sectors" and that his reputation, including his online reputation, "are important aspects of his standing in the cryptography community and his ability to maintain his consulting profession."  *Id.* ¶¶ 16, 19.

Lovecruft is a cryptographer and computer security expert.  Lovecruft Decl. ¶ 2.  They provide "expertise and consultancy services to clients," and attend and speak at conferences centering around cryptography, digital privacy, and security.  *Id.*  Lovecruft formerly worked as a senior developer for the Tor Project, a non-profit digital privacy organization.  *Id.*  Todd and Lovecruft met in summer 2014 and have been acquaintances for years.  Compl. ¶¶ 3, 24; Lovecruft Decl. ¶ 3.  They sometimes attend the same conferences and have interacted at these events.  Compl. ¶¶ 23, 26; Lovecruft Decl. ¶ 3.  Between 2014 and 2016, Todd and Lovecruft "spent time together socially on a few occasions" and also communicated with each other online.  Compl. ¶¶ 27-28; Lovecruft Decl. ¶ 3.  Lovecruft states that, prior to the events that gave rise to the current lawsuit, they considered Todd a "professional acquaintance, but not a close friend."  Lovecruft Decl. ¶ 3.  According to Lovecruft, the parties have never been in a sexual or romantic relationship.  *Id.*  Todd characterizes the parties' early relationship as a friendship.  Todd Decl. ¶ 8.

**B.      Fall 2014 Encounter**

Lovecruft claims that in 2014, Todd "began making explicit, verbal sexual advances toward [them] during conferences and meetings" and "typically did so quietly in order to not be heard by others present."  Lovecruft Decl. ¶ 4.  Lovecruft "expressly and repeatedly informed him that his advances were unwelcome" but his behavior continued.  *Id.*  According to Lovecruft, Todd sent an email in September 2015 inviting them to meet in-person to discuss a security question.  *Id.* ¶ 5.  Lovecruft agreed and met Todd at the Workshop Café in San Francisco.  *Id.*  Lovecruft testifies that Todd repeatedly interrupted the meeting to make "explicit, verbal sexual advances" which they

found "offensive and degrading." *Id.* ¶¶ 5-6. Lovecruft left the meeting, telling Todd that they were going to get food, and Todd followed without an invitation. *Id.* ¶ 7. According to Lovecruft, the parties ordered food at a taqueria, and then Lovecruft attempted to walk away. *Id.* ¶ 8. Lovecruft claims that Todd continued to follow and make sexual advances despite Lovecruft's repeated refusals. *Id.* At some point, Todd allegedly told Lovecruft that they were going back to his hotel and grabbed Lovecruft's arm. *Id.* Lovecruft shoved him away and told him, "I'm going home, don't follow me." *Id.* Lovecruft avers that Todd then stopped following them. *Id.*

Lovecruft states that the encounter left them upset and angry, and that they "walked randomly and aimlessly around San Francisco for several hours" to collect themself and make sure that Todd had stopped following them. Lovecruft Decl. ¶ 9. After that event, Lovecruft began avoiding Todd, such as by lying to him about their whereabouts when he would attempt to make contact. *Id.* ¶ 10. In December 2018, Lovecruft privately told another individual about Todd's sexual advances, but did not publicize the accusations at the time "in order to avoid further personal tension or professional drama." *Id.* ¶¶ 13-14, *see id.*, Ex. 2 (Twitter direct message dated December 5, 2018).

Todd disputes Lovecruft's account of their encounter in San Francisco. He states that he was in San Francisco in August 2015, not September as Lovecruft claims. Todd Decl. ¶ 14. He confirms they met in the Workshop Café during that visit. *Id.* ¶ 15. He says that the parties "briefly discussed computer code" and that when the café closed, they went to a taqueria together. *Id.* He testifies that the two of them ate together in the public courtyard of the Social Security Administrative building and discussed personal and professional matters while they ate. *Id.* Lovecruft fed spare nachos to rats. *Id.* After they finished eating, Lovecruft allegedly hailed a cab, stating they were going home, and Todd walked to a friend's house where he was staying. *Id.* He contends that during this time, he "made no sexual statements to Lovecruft or anybody else" and "did not initiate any physical contact with Lovecruft." *Id.* According to Todd, the parties regularly communicated with each other publicly and privately after this interaction, and that Lovecruft's communications with him "reflected no fear or dislike." *Id.* ¶ 16. Two days after the event, Lovecruft allegedly invited him to the beach and also their apartment to watch cartoons and drink

alcohol.  *Id.*  Within the following months, Lovecruft allegedly interacted with Todd and invited him to "hang out" when they attended a conference in Germany in September and October 2015. *Id.* ¶ 18.  After that time, the parties allegedly continued to communicate about a variety of personal and professional topics.  *Id.* ¶ 19.

### C.    The Applebaum Controversy

Lovecruft maintains a Twitter account and has over 20,000 followers.  Compl. ¶¶ 29, 43. They claim that in late May 2016, other individuals began making allegations of sexual assault against a third party, Jacob Applebaum, a cryptography expert who also worked for the Tor Project. *Id.* ¶ 29; Lovecruft Decl. ¶ 15.  Lovecruft publicly called for accountability for Applebaum and "participated in the broader discussions around predatory male behavior" in the cryptography field. Lovecruft Decl. ¶ 15.  On June 15, 2016, Lovecruft allegedly tweeted that Applebaum had sexually assaulted them.  Compl. ¶ 29.   They also published an internet post documenting their experience with Applebaum.  Lovecruft Decl. ¶ 15; *id.*, Ex. 3 (internet posting dated June 13, 2016).  Lovecruft claims that they have been subjected to "extensive and ongoing harassment and threats" because of their public statements about Applebaum.  *Id.* ¶ 16; *id.*, Ex. 7 (tweet dated October 11, 2016).

Todd claims that he initially published statements to Lovecruft "commending [them] on [their] bravery and denouncing sexual violence."  Compl. ¶ 30.  Then in August 2016, Todd tweeted that he "did not know what was true regarding [Lovecruft's] and other's allegations against Applebaum."  *Id.* ¶ 41; Lovecruft Decl., Ex. 8 (tweets by Todd dated June 9, 2016 and June 26, 2016).  He also tweeted, "See, as a relative outsider to that community I can't tell what is true and what isn't.  That's a big problem."  Todd Decl. ¶ 22; *id.* Ex. E (tweet dated August 18, 2016). Around that same time, Lovecruft allegedly blocked Todd from viewing their Twitter profile. Compl. ¶ 32.

In May 2017, Todd communicated with Lovecruft through Github, a "professional platform designed for public software development."  Compl. ¶ 33.  He claims that he asked Lovecruft a question about a software programming issue.  *Id.* ¶ 33.  Lovecruft responded as follows:

> First things first: **@petertodd**, you've publicly, repetitively defended a man who raped me and several other people, and disparaged the victims who were brave enough to come forward with their stories.  **Do not speak to me. Do not use work as an excuse to speak to me.  Do not use cryptography**

**as an excuse to speak to me.**

*Id.* ¶ 34; Lovecruft ¶ 18.  Todd claims that he did not initiate any contact, in-person or online, with Lovecruft after this exchange.  *Id.* ¶ 35.[2]

**D.      Doe Allegations**

In July 2017, Lovecruft told Brian Wilcox, a friend and fellow cryptographer, about their negative experiences with male predatory behavior in the cryptography community.  Lovecruft Decl. ¶ 19.  Wilcox testifies that he has personally witnessed Todd making unwelcome sexual advances on women.  [Docket No. 20-2, Declaration of Brian Wilcox in Support of Motion to Strike ("Wilcox Decl.") ¶ 4.]  He confirms that Lovecruft told him that Todd harassed and intimidated them.  *Id.* ¶ 5.  Around February 2018, Wilcox connected Lovecruft with two women who reported that Todd had engaged in sexual misconduct toward them.  *Id.* ¶ 7; Lovecruft Decl. ¶ 20.  One woman, anonymously identified as Jane Doe, reached out to Lovecruft over the Signal messaging platform.  Lovecruft Decl. ¶ 20.

Doe submitted a partially redacted anonymous declaration confirming this conversation.  [Docket No. 30-3, Declaration of Jane Doe in Support of Motion to Strike ("Doe Decl.").]  Lovecruft's counsel Ben Rosenfeld testifies that he personally spoke to Doe and prepared the declaration on her behalf.  [Docket No. 20-4, Declaration of Ben Rosenfeld in Support of Motion to Strike ("Rosenfeld Decl.") ¶ 2.]  Lovecruft initially filed the declaration with their motion, and the signature line was endorsed by the declarant as Jane Doe.  [Rosenfeld Decl., Ex. A.]  They later filed an administrative motion to seal the declaration because portions of it, specifically the name of the city in which the events described occurred, could potentially identify the anonymous declarant.  [Docket No. 22.]  Lovecruft filed a slightly modified version of the declaration on reply.[3]

---

[2] Applebaum submitted a declaration in support of Todd's opposition to this motion.  [Docket No. 25.] Applebaum describes his own experiences as a "target" of Lovecruft's defamation.  Applebaum is not a party; therefore, his assertions about being defamed by Lovecruft are not relevant to this motion.  To the extent Todd offers Applebaum's declaration as evidence to support that Lovecruft acted with malice in making defamatory statements about Todd, the court, without ruling on the admissibility of Applebaum's statement for that purpose, finds that it need not consider Applebaum's proffered evidence to rule on this motion, as discussed below in the analysis of Lovecruft's state of mind.  Finally, the court cannot consider Applebaum's declaration to the extent it is offered to attack Lovecruft's credibility.  *See Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 699 (2007).

[3] All subsequent references to the Doe declaration refer to the most recent version filed with the

This version contains a redaction as to the name of the city in which the alleged encounter took place and the redacted name and signature of the declarant.[4]

On February 15, 2018, Lovecruft and Doe allegedly discussed their mutual experiences with Todd. Lovecruft Decl. ¶ 20; Doe Decl. ¶ 3. During that conversation, Doe explicitly told Lovecruft that Todd had raped her. Doe Decl. ¶ 3. She informed Lovecruft that she and Todd met in Germany. *Id.* Doe states that she suffers from a neurological sleep disorder and was also sleep deprived on the day that she met with Todd. *Id.* While she and Todd were walking together, her knees buckled as she began experiencing symptoms of her disorder. *Id.* She told Todd the symptoms he could expect to see, such as cognitive defects and temporary paralysis, and Todd suggested they go to the nearest hotel for her to sleep off the symptoms. *Id.* Doe testifies that she went up to Todd's room and attempted to sleep on the couch so as not to send Todd any "wrong signals," but he "physically crowded [her] and badgered [her] into sleeping in his bed." *Id.* Once Doe laid down on the bed, Todd allegedly got into bed next to her. *Id.* She states that she fell asleep and woke up sometime later, still under effects of her sleep condition. *Id.* She let Todd take her to dinner, after which she felt "a sense of obligation to hang out with him a little longer because he had paid for dinner." *Id.* They went back up to his hotel room, where Doe testifies that Todd "began pushing [her] physical boundaries" again, although she attempted to leave several times. *Id.* She states that she realized she could not leave and gave up resisting, and that she "consider[s] what happened next rape." *Id.* Doe told Lovecruft that she locked herself in the bathroom afterward and cried for hours. *Id.* She also told Lovecruft that she had heard accounts from three or four other people who experienced sexual harassment by Todd. Lovecruft Decl. ¶ 21.

Lovecruft states that they believed Doe's account of the incident for several reasons. First, Lovecruft states that they "believe rape victims," citing to reports and studies by "the BBC, FBI [and] CDC" that conclude that false rape allegations make up as low as 1.5% of all rape allegations. Lovecruft Decl. ¶ 22. Lovecruft also represents that they believed Doe because Doe provided

---

declarant's name redacted.

[4] The court grants the parties' stipulation to file the redacted versions of the Doe Declaration in the public docket.

"extensive details of her encounter" with Todd; because Doe corroborated the stories Lovecruft had heard from others about Todd; and because of Lovecruft's own experience with Todd and similarities between their encounters. *Id.* Lovecruft admits that they made each of the statements quoted in the complaint, and that they continue to believe the truth of each statement. *Id.* ¶ 25.

**E.   The Statements**

Todd identifies Wilcox as the founder and CEO of Zcash, a cryptocurrency business, and states that Lovecruft has done work for that business. Todd Decl. ¶ 24. On May 14, 2018, Todd published a tweet criticizing the security of Zcash. *Id.* ¶ 25; *id.*, Ex. G (tweet dated May 14, 2018). Within hours of Todd's tweet, Lovecruft tweeted:

> peter todd is complete trash, and not just for his idiotic takes on privacy and security, he's also an abuser who doesn't seem to understand the word 'no' and harasses rape victims (and he's managed to be the only person I've ever had to block on github).

*Id.*, Ex. H (tweet dated May 14, 2018). Todd testifies that he criticized Zcash again on February 5, 2019. *Id.* ¶ 27; *id.*, Ex. I (tweets dated February 5, 2019).

Within the same month, Lovecruft made four statements (the "Statements") on their Twitter feed that accused Todd of committing sexual misconduct and rape against Lovecruft and others. Compl. ¶¶ 36-39. On February 5, 2019, the same day Todd posted the second criticism of Zcash, Lovecruft tweeted:

> This is not even touching upon the stories of the rape and assault survivors of you and @petertodd and @ioerror [Applebaum's Twitter account] and you all have been seen to behave conveniently alike and seen to dutifully protect one another [upside-down smiley face emoji].

*Id.* ¶ 36; Todd Decl., Ex. A. Upon viewing the tweet in the context of the relevant portions of Lovecruft's Twitter feed, it becomes clear that the "you" in "rape and assault survivors of you" is third party Nadim Kobeissi, who submitted a declaration attesting that Lovecruft falsely accused him of engaging in sexual misconduct toward Lovecruft and others. [Docket No. 27, Declaration of Nadim Kobeissi in Opposition to Motion to Strike ("Kobeissi Decl.") ¶¶ 6-10.][5] However, this tweet also refers to Todd and Applebaum. Lovecruft tweeted again on February 8, 2019, stating:

---

[5] The court does not consider Kobeissi's declaration for the same reasons stated above in footnote 2 regarding Applebaum's declaration.

United States District Court
Northern District of California

> i love watching the men in my industry who've sexually abused me and many others squirm as I take them out one by one while they nervously await their turn [¶] hahahahahahahaha eat goat dung you epoxy brained cowards

Todd Decl., Ex. A.  Lovecruft's tweet on February 20, 2019 reads:

> Nadim Kobeissi is a serial rapist and abuser who defends other rapists including Jacob Appelbaum and Peter Todd and in 2012 he grabbed my face and force kissed me at a conference and i absolutely believe the multiple survivors I've personally spoken with since then

*Id.*  Later that day, another user asked Lovecruft, "Peter todd is a rapist?"  *Id.*  Lovecruft tweeted in response:

> yes, similar to Nadim, i personally have a story about Peter Todd and i've personally spoken with survivors with absolutely awful and horrifying reports who are terrified of him and of coming forward (rightly so) [¶] i however am not afraid and shitty dudes are going down

*Id.*

Todd asserts that the Statements "contain and comprise false assertions of fact," because he has not sexually assaulted or raped Lovecruft or anyone else.  Compl. ¶¶ 40-42.  He claims that Lovecruft knew the Statements were false when Lovecruft made them, or alternatively, that Lovecruft acted "in reckless disregard of the falsity of [their] Statements when [Lovecruft] published them."  *Id.* ¶ 45.  He also alleges that "[n]umerous people have viewed [Lovecruft's] Statements, and numerous people have publicly commented on [the] Statements."  *Id.* ¶ 44.  According to Todd, the Statements remain publicly viewable on Lovecruft's Twitter account.  *Id.* ¶ 46.  He also contests the facts presented in the Doe declaration, and states that he believes Lovecruft and possibly Wilcox "fabricated the declaration of Jane Doe."  Todd Decl. ¶ 33.  He testifies that he "did not rape, assault, or coerce anybody into having sex" with him.  *Id.*

### F.    Claims

Todd brings a state law defamation claim against Lovecruft.  Compl. ¶¶ 49-61.  He alleges that Lovecruft published the Statements "willfully and maliciously with the intent to harm [him]," and that as a result he has suffered "shame, embarrassment, hurt feelings, anxiety, mortification, embarrassment, [] loss [of] reputation among his friends, peers, and in his professional community," and has also lost professional opportunities such as invitations to speak at conferences.  *Id.* ¶¶ 58-

United States District Court
Northern District of California

60.  He is seeking a permanent injunction requiring Lovecruft to remove the allegedly defamatory Statements from their Twitter account, and an award of damages, including compensatory and punitive damages, costs of suit, and pre-judgment interest.  Compl. at 8.

## II.   LEGAL STANDARD FOR CALIFORNIA ANTI-SLAPP MOTIONS IN FEDERAL COURT

Known as the "anti-SLAPP" statute,[6] California Code of Civil Procedure section 425.16 "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation."  *Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1188 (9th Cir. 2017) (quoting *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001)).  The statute provides that a claim against an individual "arising from any act of that person in furtherance of the person's right of petition or free speech" under the federal or California constitutions "shall be subject to a special motion to strike . . . ."  Cal. Civ. Proc. Code § 425.16(b)(1).

Under California law, "[t]he analysis an anti-SLAPP motion proceeds in two steps."  *Iglesia Ni Cristo v. Cayabyab*, No. 18-cv-00561-BLF, 2019 WL 3997474, at *2 (N.D. Cal. Aug. 23, 2019) (quoting *Barry v. State Bar of California*, 2 Cal. 5th 318, 321 (2017)).  First, the court determines whether the plaintiff's claims are directed at "an act in furtherance of protected expression."  *Metabolife*, 264 F.3d at 840 (citing Cal. Civ. Proc. Code § 425.16(b)).  The moving defendant bears the burden of "identifying all allegations of protected activity, and the claims for relief supported by them."  *Baral v. Schnitt*, 1 Cal. 5th 376, 396 (2016).  At the second step, the burden shifts to the plaintiff to show a "reasonable probability of prevailing in its claims."  *Metabolife*, 264 F.3d at 840.  The plaintiff must demonstrate that "each challenged claim based on protected activity is legally sufficient and factually substantiated."  *Baral*, 1 Cal. 5th at 396.

A district court sitting in diversity must apply the federal standard for such motions.  The tension in applying anti-SLAPP laws in federal court arises from the doctrine expressed in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); namely, that federal courts sitting in diversity apply state law to matters of substance, but federal law governs matters of procedure.  *See Hanna v.*

---

[6] "SLAPP" is an acronym for "strategic lawsuit against public participation."

United States District Court
Northern District of California

United States District Court
Northern District of California

1   *Plumer*, 380 U.S. 460, 473 (1965).  California's anti-SLAPP law contains several provisions that

2   give heightened protection to anti-SLAPP defendants, including the availability of a special motion

3   to strike, interlocutory appeals, attorneys' fees and costs, and a stay on discovery.  *See* Cal. Code

4   Civ. Proc. § 425.16.  Whether any of these provisions are procedural and conflict with the Federal

5   Rules of Civil Procedure has been "hotly disputed."  *Planned Parenthood Fed'n of Am., Inc. v. Ctr.*

6   *for Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018).

7       The Ninth Circuit first considered the federal application of California's anti-SLAPP law

8   in *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999).  In that

9   case, the district court refused to apply section 425.16, finding that the provisions permitting a

10   special motion to strike and allowing the recovery of attorneys' fees and costs directly conflicted

11   with Federal Rules 8, 12, and 56.  *Id.* at 972.  On appeal, the Ninth Circuit determined that those

12   provisions and the Federal Rules "can exist side by side . . . each controlling its own intended sphere

13   of coverage without conflict."  *Id.* (quoting *Walker v. Armco Steel*, 446 U.S. 740, 752 (1980)).  The

14   court found that although the anti-SLAPP statute and the Federal Rules "serve similar purposes,

15   namely the expeditious weeding out of meritless claims before trial," there is not a direct collision

16   between those authorities because "there is no indication that Rules 8, 12, and 56 were intended to

17   'occupy the field' with respect to pretrial procedures aimed at weeding out meritless claims."  *Id.*  It

18   also held that the "twin aims" of *Erie* ("discouragement of forum-shopping and avoidance of

19   inequitable administration of the law") weighed in favor of applying California's anti-SLAPP statute

20   in federal court.  *Id.* at 973 (quoting *Hanna*, 380 U.S. at 468).  Accordingly, the court reversed the

21   district court and affirmed the availability of anti-SLAPP motions in federal court.  *Id.*

22       The Ninth Circuit revisited the anti-SLAPP statute two years later in *Metabolife*.  *Metabolife*

23   reaffirmed *Newsham* in finding that the provisions regarding a special motion to strike and the

24   availability of attorneys' fees and costs are applicable in federal court.  264 F.3d at 845.  However,

25   the court determined that two other provisions of the statute, subsections 425.16(f) and (g), conflict

26   with the Federal Rules and cannot be applied in federal diversity cases.  *Id.* at 486.  These rules

27   relate to the discovery stay provisions of California's anti-SLAPP law: subsection 425.16(f)

28   provides that an anti-SLAPP motion may be filed within sixty days of the filing of the complaint (or

any later date, at the court's discretion), and subsection 425.16(g) automatically stays all discovery until the court rules on the anti-SLAPP motion. *Id.* *Metabolife* examined these provisions in light of Rule 56's requirement that "adequate discovery will occur before summary judgment is considered," and concluded that the "discovery-limiting aspects of [subsections] 425.16(f) and (g) collide with the discovery-allowing aspects of Rule 56" and therefore cannot apply in federal court. *Id.* (quoting *Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 982-83 (C.D. Cal. 1999)).

The anti-SLAPP statute came before the Ninth Circuit again in *Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir. 2013). There, the court applied the burden-shifting framework of section 425.16 in reviewing a district court's denial of an anti-SLAPP motion. 715 F.3d at 261. *Makaeff* is of particular interest in that it showcases some of the conflicting views of the applicability of anti-SLAPP motions among circuit jurists. In a concurring opinion, Judge Kozinski agreed that the majority "faithfully applies [the] law" as articulated in *Newsham* but wrote separately to opine that *Newsham* is "wrong and should be reconsidered." *Id.* at 272 (Kozinski, J., concurring). He reasoned that Rules 12 and 56 already provide procedural mechanisms for disposing of claims before trial, and section 425.16 impermissibly alters the federal scheme by allowing a defendant to "get a case dismissed for factual insufficiency while concealing evidence that supports [the] plaintiff's case." *Id.* at 274. He concluded that California's anti-SLAPP law "has no application in federal court." *Id.* at 273. The Ninth Circuit declined to reconsider *Makaeff* en banc. *Makaeff v. Trump University, LLC*, 736 F.3d 1180 (9th Cir. 2013). In dissent to that decision, Judge Watford agreed with Judge Kozinski that the state statute conflicts with Federal Rules 12 and 56. *Id.* at 1188. He opined that an anti-SLAPP motion to strike conflicts with Rule 12 in that it "impose[s] a probability requirement at the pleading stage," and conflicts with Rule 56 because it "requir[es] the plaintiff to prove that she will probably prevail if the case proceeds to trial—a showing considerably more stringent than identifying material factual disputes that a jury could reasonably resolve in the plaintiff's favor." *Id.* at 1189.

The Ninth Circuit most recently addressed California's anti-SLAPP statute in *Planned Parenthood*, where it discussed a tension between the state law and federal procedure. When a defendant files an anti-SLAPP motion in California state court, "[a]ll discovery proceedings in the

11

action" are stayed and the discovery stay "remain[s] in effect until notice of the entry of the order ruling on the motion." Cal. Code Civ. Proc. § 425.16(g). However, in federal court, "[r]equiring a presentation of evidence without accompanying discovery would improperly transform the motion to strike . . . into a motion for summary judgment without providing any of the procedural safeguards that have been firmly established by the Federal Rules of Civil Procedure." *Planned Parenthood*, 890 F.3d at 833-34. The court held that preserving the discovery stay aspect of section 425.16 "would effectively allow the state anti-SLAPP rules to usurp the federal rules" and that the court cannot "properly allow such a result." *Id.* at 834. Accordingly, *Planned Parenthood* set forth the standard that district courts must now apply in evaluating anti-SLAPP motions:

> If a defendant makes an anti-SLAPP motion to strike founded on purely legal arguments, then the analysis is made under [Rule] 8 and 12 standards; if it is a factual challenge, then the motion must be treated as though it were a motion for summary judgment and discovery must be permitted.

*Id.* at 833 (quoting *Z.F. v. Ripon Unified School District*, 482 Fed. App'x 239, 240 (9th Cir. 2012)). For purely legal challenges, there is no need for the party opposing the motion to "submit evidence showing the merit of their claims." *Id.* at 834. For factual challenges, "discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court." *Id.*

In this case, Lovecruft's motion contains both legal and factual challenges to the complaint. At the hearing, the court informed the parties that it would decide the legal challenges under Rule 12 standards, as directed by *Planned Parenthood*, but that the factual challenges were premature as no discovery had yet taken place. Both parties represented to the court that they waived the right to conduct discovery and requested that the court rule on the merits of the entire anti-SLAPP motion. The court ordered the parties to submit supplemental briefing on *Planned Parenthood* and required the parties to explain their positions, citing relevant federal authority, on how to apply the *Planned Parenthood* framework to the current motion. The central concern of the court's inquiry was whether *Planned Parenthood*'s direction to treat an anti-SLAPP motion with factual challenges as a motion for summary judgment eliminated California's two-prong burden-shifting approach in favor of Rule 56's "genuine dispute of material fact" standard.

Upon reviewing the parties' supplemental briefs as well as pre- and post-*Planned Parenthood* federal authority, the court finds that *Planned Parenthood* did not eliminate the evidentiary burden applied by California's anti-SLAPP statute. Notably, that case does not mention or address whether there is a conflict between section 425.16's "reasonable probability" standard and Rule 56's "genuine dispute of material fact" standard.

Several other Circuits have addressed this question directly and have found that similar state anti-SLAPP statutes impermissibly alter the Rule 56 standard. For example, the D.C. Circuit addressed the issue in *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015) and determined that the District of Columbia anti-SLAPP statute's "likelihood of success standard is different from and more difficult for plaintiffs to meet than the standards imposed by Federal Rules 12 and 56." 783 F.3d at 1335. It held that the state law "conflicts with the Federal Rules by setting up an additional hurdle a plaintiff must jump over to get to trial," and therefore could not be applied in federal court. *Id.* at 1334, 1337. Similarly, in *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345 (11th Cir. 2018), the Eleventh Circuit held that Georgia's anti-SLAPP statute does not apply in federal court. The court determined that the statute's motion-to-strike procedure conflicts with Rule 56 because it "contemplates a substantive, evidentiary determination of the plaintiff's probability of prevailing on his claims," while Rule 56 only requires the nonmovant to "designate specific facts showing that there is a genuine issue for trial." 910 F.3d at 1350-51 (citations and quotation marks omitted). The Fifth and Tenth Circuits have also found a conflict between state anti-SLAPP laws and the Federal Rules of Civil Procedure. *See Klocke v. Watson*, 936 F.3d 240, 245 (5th Cir. 2019), *as revised* (Aug. 29, 2019) ("Because the [Texas anti-SLAPP law's] burden-shifting framework imposes additional requirements beyond those found in Rules 12 and 56 and answers the same question as those rules, the state law cannot apply in federal court."); *Los Lobos Renewable Power, LLC v. Americulture, Inc*, 885 F.3d 659, 673 (10th Cir.), *cert. denied sub nom. AmeriCulture, Inc. v. Los Lobos Renewable Power, LLC*, 139 S. Ct. 591, 202 (2018) (holding that the New Mexico anti-SLAPP statute "simply does not define the scope of any state substantive right or remedy . . . . the statute is procedural in all its aspects"). In contrast, the First Circuit has held that there is no conflict between Maine's anti-SLAPP law and the Federal Rules because "Rules

12(b)(6) and 56 are addressed to different (but related) subject-matters." *Godin v. Schencks*, 629 F.3d 79, 88 (1st Cir. 2010).

Considering the circuit split on this issue, *Planned Parenthood*'s summary admonition to apply Rule 56 to factual anti-SLAPP challenges is, at best, murky. But if the Ninth Circuit wanted to eliminate the "reasonable probability" standard applied in California's anti-SLAPP law, it could have done so directly. Judges Kozinski and Watford wrote lengthy opinions addressing the purported conflicts between Rule 56 and section 425.16, and *Planned Parenthood* does not cite either opinion. Nor does it give any indication that it intended to overrule the majority decision in *Makaeff* and other Ninth Circuit jurisprudence applying the evidentiary standard of section 425.16. Indeed, a recent unpublished circuit opinion seems to suggest that the "probability of prevailing" standard survives *Planned Parenthood*. *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 2019 WL 6048852, at *2 (9th Cir. Nov. 15, 2019). This court cannot assume that the Ninth Circuit reversed course on a central issue without a direct statement to that effect.

In light of these considerations and in the absence of clear controlling authority to the contrary, the court interprets *Planned Parenthood* to mean that Rule 56 applies to anti-SLAPP motions insofar as it must permit discovery before a court considers the evidentiary record. However, it does not require the court to apply the Rule 56 burdens instead of the two-pronged, burden-shifting framework applied by California courts.[7] Reading *Planned Parenthood* together with the state framework, the court determines that in evaluating an anti-SLAPP motion, it must first apply step one of the burden-shifting standard and look at whether the plaintiff has met the burden to show that the statements were made "in furtherance of protected expression." *Metabolife*, 264 F.3d at 840. Then on step two, the court looks at whether the defendant's challenges are legal or factual. *See ITN Flix, LLC v. Hinojosa*, 2019 WL 3562669, at *2 (C.D. Cal. Aug. 6, 2019)

---

[7] District courts in this circuit have continued to apply the state framework to anti-SLAPP motions following *Planned Parenthood*. *See, e.g.*, *ITN Flix, LLC v. Hinojosa*, WL 3562669, at *2 (C.D. Cal. Aug. 6, 2019); *Tensor Law P.C. v. Rubin*, 2019 WL 3249595, at *4 (C.D. Cal. Apr. 10, 2019); *Appel v. Wolf*, 2018 WL 6726797, at *2 (S.D. Cal. Dec. 20, 2018); *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15-cv-03522-WHO, 2018 WL 5879786, at *10 (N.D. Cal. Nov. 7, 2018); *Iglesia Ni Cristo v. Cayabyab*, No. 18-cv-00561-BLF, 2019 WL 3997474, at *2 (N.D. Cal. Aug. 23, 2019); *Nano Found., Ltd. v. Silver*, 2019 WL 6723428, at *2 (C.D. Cal. Aug. 20, 2019). However, no court has explicitly analyzed whether *Planned Parenthood*'s direction to use Rule 56 in considering factual anti-SLAPP challenges supplanted the state law "reasonable probability" burden.

United States District Court
Northern District of California

(applying the *Planned Parenthood* distinction at step two of the anti-SLAPP analysis).   If the challenges are legal, the court evaluates those challenges under a Rule 12 analysis.   If they are factual, then the court must permit discovery under Rule 56.   Once discovery has been completed, then the court applies the "reasonable probability" standard to the plaintiff's claims.   This is the standard the court will apply to the current motion.

A final concern must be addressed in this case.   *Planned Parenthood* unambiguously states that "discovery must be allowed" before the court rules on a defendant's factual challenges.   *Planned Parenthood*, 890 F.3d at 834.   For a motion such as the current one that involves both legal and factual challenges, the court would likely have to address the issues in two stages.   First, the court would apply the two-step framework to the defendant's legal challenges; if any of the plaintiff's claims did not survive that analysis, they would be dismissed as under Rule 12.   However, unlike in state court, which requires the claims to be stricken without leave to amend, federal procedure mandates that a plaintiff who loses an anti-SLAPP motion must have the opportunity to amend the complaint.   *Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004) ("[G]ranting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment.").   At the second stage, after the plaintiff filed an amended complaint and the parties conducted discovery, the court would address the defendant's factual challenges.

In this case, however, the parties have explicitly waived their right to conduct discovery and have requested that the court rule on all the challenges—both legal and factual—in a single order. The court did not identify any authority that requires it to reject the parties' express waivers; even *Planned Parenthood* stated that "discovery must be *allowed*," not that discovery must occur.   *See Planned Parenthood*, 890 F.3d at 834 (emphasis added).   Accordingly, the court determines that it can rule on the factual challenges in this motion without requiring the parties to conduct discovery.

## III.    EVIDENTIARY CHALLENGES

Todd raises objections to some of the evidence submitted by Lovecruft, including the entirety of the Doe declaration and portions of the declarations by Lovecruft, Wilcox, and attorney Rosenfeld.   Opp. at 8-9.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### A.     Doe Declaration

Todd argues that the court should disregard the Doe declaration in its entirety on the basis that it contains testimony from an anonymous source.  "[C]ourts of this country recognize a general right to inspect and copy public records and documents."  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). There is therefore a "strong presumption in favor of access" to public documents, including court filings.  *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003).  A party seeking to seal a document attached to a dispositive motion must show "compelling reasons" that "outweigh the general history of access and the public policies favoring disclosure, such as the 'public interest in understanding the judicial process.'"  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995) (further citations omitted)).  In her declaration, Doe states that she submitted the declaration anonymously because she fears harassment and retaliation if she uses her real name.  Doe Decl. ¶ 1.  She agreed to submit her declaration, with her name and minor identifying details redacted, on the condition that the redacted portions remain under seal.  *Id.*

In arguing that the Doe declaration should not be considered, Todd cites *Diamond Pleasanton Enter., Inc. v. City of Pleasanton*, No. 12-cv-00254-WHO, 2015 WL 74946 (N.D. Cal. Jan. 5, 2015) ("*Diamond*") for the proposition that "[a]bsent extraordinary circumstances, witnesses do not testify anonymously under our systems of laws."  2015 WL 74946, at *1.  *Diamond* involved a commercial enterprise challenging the defendant's condition use permit requirements as unconstitutional.  2015 WL 74946, at *1.  In its motion for summary judgment, the city cited to the deposition transcript of a former employee of the plaintiff corporation.  *Id.*  The employee later sought to have her name sealed from the court record, representing that she was not a party to the case and that having her name associated with the case was damaging to her professional career.  *Id.*  The court denied the motion to seal on the basis that the declarant did not identify how public identification in the court record would damage her professional career.  *Id.*

Todd also cites *Doe v. Los Angeles Unified Sch. Dist.*, 2017 WL 797152 (C.D. Cal. Feb. 27, 2017), a case in which a plaintiff submitted anonymous declarations from three of her friends, each of which redacted the name and signature of the declarant.  In declining to consider the declarations,

United States District Court
Northern District of California

the court cited 28 U.S.C. § 1746, which requires unsworn declarations to be signed by the declarant under the penalty of perjury. *Id* at *9. The court specifically noted that the plaintiff had not submitted any document identifying the signators or sought an order to keep the names of witnesses under seal. *Id.* It stated that it could "discern no basis for the admission and consideration of anonymous witness declarations." *Id.* The court accordingly held that "[w]ithout any record whatsoever of a witness's identity or their signature, a declarant cannot be held to their statements under 'penalty of perjury.'" *Id.*

Neither case is persuasive here. In contrast to *Diamond*, where the witness offered only a conclusory allegation of professional harm in the context of a permit dispute, the potential impacts of publicly identifying as a rape victim are far more apparent and severe. The Ninth Circuit has recognized that courts have permitted the use of pseudonyms "[w]here it is necessary . . . to protect a person from harassment, injury, ridicule or personal embarrassment . . . ." *United States v. Doe*, 655 F.2d 920, 922 n. 1 (9th Cir. 1980) (allowing the appellant, who was serving a prison sentence, to proceed anonymously for fear of retaliation by other inmates); *see also Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1070 (9th Cir. 2000) ("[T]his court and others have concealed parties' identities in order to protect them from retaliation by third parties and also to protect nonparties from reprisals."). It is well-recognized that reports of sexual assault and rape are often met with intense public attention and scrutiny, which poses a serious threat to the privacy and safety of the reporter. *See* Krista M. Anderson, *Twelve Years Post Morrison: State Civil Remedies and A Proposed Government Subsidy to Incentivize Claims by Rape Survivors*, 36 Harv. J. L. & Gender 223, 228 (2013) ("When survivors do report their rapes, they face an onslaught to their privacy from their immediate community, police investigators, media outlets, prosecutors, and defense attorneys."). A press release by the federal Bureau of Justice Statistics reports that approximately 65% of rapes and sexual assaults between 2006 and 2010 were not reported to the police. Bureau of Justice Statistics, *Nearly 3.4 Million Violent Crimes Per Year Went Unreported to the Police From 2006 to 2010* (August 9, 2012), https://www.bjs.gov/content/pub/press/vnrp0610pr.cfm; *see also* Bureau of Justice Statistics, *Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013*, at 1, 9 (2014) (finding

that student women ages 18-24 reported rape and sexual assault to the police in 20% of cases, compared to 32% reporting by non-student women of the same age group).  Reasons for not reporting sexual assault or rape include self-blame, guilt, shame and embarrassment, fear of the perpetrator or the perceptions of others, fear of not being believed, and lack of trust in the criminal justice system.  *See* National Institute of Justice, *Reporting of Sexual Violence Incidents* (October 25, 2010), https://nij.ojp.gov/topics/articles/reporting-sexual-violence-incidents; *see also* Deborah Tuerkheimer, *Beyond #metoo*, 94 N.Y.U. L. Rev. 1146, 1155 (2019) ("At every stage of the criminal process, allegations of sexual assault are mostly treated with skepticism, especially in cases involving acquaintances.").  "With regard to allegations of sexual assault or sexual harassment in particular, courts in the Ninth Circuit have found that allowing victims to proceed anonymously serves a strong public interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes."  *Heineke v. Santa Clara Univ.,* No. 17-cv-05285-LHK, 2017 WL 6026248, at *22 (N.D. Cal. Dec. 5, 2017) (citations and internal quotation marks omitted).  The privacy and safety interests of Doe in this case are substantial and weigh in favor of permitting consideration of the declaration without requiring Doe to publicly testify.

*Doe* is also distinguishable.  Unlike in *Doe*, where the plaintiff did not offer any justification for submitting anonymous declarations, Doe has asserted a strong interest in not identifying publicly as a rape victim.  In addition, Doe has submitted a document under seal with her real name, which she signed under penalty of perjury.  This is not similar to *Doe*, where the court could not discern whether the declarants were "actually signed by any witness" because the signature blocks were redacted.  *See* 2017 WL 797152, at *9.  The court therefore can hold Doe to her statements under penalty of perjury.

Nor does the court's consideration of the Doe declaration prejudice Todd.  He does not represent that he does not know Doe's identity, although he easily could have done so on the record.[8] Todd also had the right to insist on conducting discovery prior to the court reaching Lovecruft's factual challenges and could have sought additional information about Doe and her allegations,

---

[8] The parties stipulated to file the Doe declaration as redacted, but it is not clear whether Todd received a copy of the unredacted declaration or denies knowing the identity of the declarant.

United States District Court
Northern District of California

including by taking her deposition.  Todd explicitly waived that right.  He may dispute the facts of his encounter with Doe or disagree with her characterization of the event as a rape, but there is no barrier to his being able to respond to Doe's accusations without a public identification of the declarant.

Accordingly, the court finds that the Doe declaration is competent evidence for the purposes of this motion.

**B.      Lovecruft Declaration**

Todd objects to consideration of two exhibits attached to Lovecruft's declaration.  The first, Exhibit 2, is a series of screenshots purportedly documenting Lovecruft's private conversation on Twitter with an unidentified third party.  *See* Lovecruft Decl. ¶¶ 13-14; *id.*, Ex. 2.  The second exhibit is screenshots of the Signal message exchange between Lovecruft and Doe.  *See* Lovecruft Decl., Ex. 9.  Todd objects to both exhibits on the basis that they are "facially incomplete, do not refer to him by name, and do not identify the person communicating with Lovecruft."  Opp. at 9.  He seeks to exclude both exhibits as inadmissible under Federal Rule of Evidence 901.

Both exhibits are unnecessary for the court's analysis.  The only issue for which Exhibit 2 is relevant is to show Lovecruft's credibility as to their accusations that Todd engaged in sexual misconduct toward them personally.  However, the court cannot consider the credibility of either party in deciding this motion.  *Overstock.com, Inc.*, 151 Cal. App. 4th at 699 (stating that the court does not weigh credibility or evaluate the weight of the evidence in ruling on an anti-SLAPP motion).  Nor is the court deciding the truth of whether Todd assaulted Lovecruft, which is a "question of fact for trial."  *Moyer v. Amador Valley J. Union High Sch. Dist.*, 225 Cal. App. 3d 720, 724 n. 2 (1990).  Because the court does not consider Exhibit 2 in the present motion, Todd's request to exclude it is denied as moot.

Exhibit 9 documents the text conversation between Lovecruft and Doe.  This exhibit is also unnecessary for the court's analysis.  Both Lovecruft and Doe describe the contents of their conversation in their declarations.  Both declarations are signed under penalty of perjury and are admissible evidence for the purposes of this motion.  Any information contained in the screenshots of their exchange is at most duplicative of the facts attested to in the declarations, and the court need

not separately consider the contents of Exhibit 9.  Accordingly, Todd's request to exclude Exhibit 9 is also denied as moot.

### C.     Wilcox Declaration

In his declaration, Wilcox testifies that he personally witnessed another friend of his (not Lovecruft or Doe) experience unwanted advances by Todd.  Wilcox Decl. ¶ 4.  Wilcox also confirms that Lovecruft told him about Todd's "persistent and unwanted sexual advances" on July 10, 2017. *Id.* ¶ 5.  He states that he learned later from Doe that Todd had pressured her into sex while she was "in a mentally compromised state due to a medical condition." *Id.* ¶ 6.  Todd argues that these statements contain statements by Lovecruft, Doe, and the third individual that are hearsay and inadmissible.  Opp. at 9.

Hearsay is defined as an out-of-court statement that is offered to "prove the truth of the matter asserted."  Fed. R. Evid. 802.  To the extent that the third-party statements in the Wilcox declaration are offered to prove the truth of the matter asserted (namely, that Todd sexually assaulted or made unwanted advances on any of the three individuals), they are excluded as inadmissible hearsay.  The non-hearsay portions of the declaration are unnecessary for the court's analysis.  They at most support Doe's credibility as to her encounter with Todd, or Lovecruft's credibility that they spoke with Doe about Todd.  The court cannot weigh credibility in ruling on an anti-SLAPP motion. *Overstock.com*, 151 Cal. App. 4th at 699.  Accordingly, the court does not consider any portion of the Wilcox declaration in ruling on this motion.

### D.     Rosenfeld Declaration

Todd seeks to exclude paragraph 2 of the Rosenfeld declaration on the basis that it is inadmissible hearsay.  In that paragraph, Lovecruft's counsel testifies that he spoke with Doe on the phone on July 12, 2019 and prepared her declaration under a pseudonym using the information she provided to him.  Rosenfeld Decl. ¶ 2.

The court notes that the declaration does not appear to relay any statements by Doe herself. However, to the extent that Rosenfeld's conversation with Doe is offered to prove that Todd actually assaulted Doe, the content of that conversation is excluded as inadmissible hearsay.  The court may consider this portion of the Rosenfeld declaration for other purposes, including that Rosenfeld spoke

with Doe and prepared her declaration based on the facts she relayed to him.  These facts are within Rosenfeld's personal knowledge and are not hearsay.

## IV.    DISCUSSION

### A.    Protected Activity

"The first step in analyzing an anti-SLAPP motion is determining whether the defendant successfully made 'an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech.'"  *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 967 (N.D. Cal. 2013) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003)) (further citations omitted).  A protected act includes "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest."  Cal. Code Civ. Proc. § 425.16(e).  The defendant's burden on this step "is not a particularly demanding one."  *Daniel v. Wayans*, 8 Cal. App. 5th 367, 387 (Ct. App. 2017).  In order to meet the burden at step one of the anti-SLAPP analysis, the defendant must establish that the challenged statements were made (1) in a public forum and (2) in connection with an issue of public interest.

#### 1.    Public Forum

All the Statements at issue were published on Lovecruft's public Twitter feed.  "Web sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute."  *Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 (2006); *see also Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 199 (Ct. App. 2017) (finding that "[i]t cannot be disputed that Facebook's website" is a public forum within the meaning of section 425.16(b)(1)); *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1252 (Ct. App. 2017), *as modified* (Apr. 19, 2017) (finding that postings on Facebook and Instagram were made in a public forum).

Todd does not dispute that Twitter is a public forum for the purposes of the anti-SLAPP statute.  Accordingly, Lovecruft has met their burden on this issue.

#### 2.    Public Interest

The anti-SLAPP statute does not define "public interest," but "its provisions 'shall be construed broadly' to safeguard 'the valid exercise of the constitutional rights of freedom of speech

United States District Court
Northern District of California

21

and petition for the redress of grievances.'" *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 693 (2012) (quoting Cal. Code Civ. Proc. § 425.16(a)). In determining whether an issue is a matter of public interest, courts may consider "whether the subject of the speech or activity was a person or entity in the public eye or could affect large numbers of people beyond the direct participants; and whether the activity occur[red] in the context of an ongoing controversy, dispute or discussion." *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 145 (2019) (internal quotation marks and citations omitted). "[A] matter of public interest should be something of concern to a substantial number of people. Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest." *Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1132 (2003) (internal citation omitted). In addition, there should be "some degree of closeness between the challenged statements and the asserted public interest." *Id.* "[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." *FilmOn.com*, 7 Cal. 5th at 150 (quoting *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 898 (2004)).

Lovecruft asserts that the Statements relate to sexual harassment and violence against women, which is a matter of "pressing public concern." Mot. at 8 (quoting *Carney v. Santa Cruz Women Against Rape*, 221 Cal. App. 3d 1009, 1021 (1990)). Lovecruft argues that "calling out prominent and powerful men who have engaged in sexual assault" is one of the core issues of the public debate around sexual misconduct, and that their accusations against Todd are directly connected to that issue. *Id.* Todd does not dispute that sexual harassment and violence against women is a matter of public interest but asserts that Lovecruft's tweets are "pure invective" and contain "absolutely no exploration, analysis, or discussion" of sexual harassment and violence against women. Opp. at 12. He also argues that the tweets at issue related to the parties' private dispute about Lovecruft's Zcash business rather than the asserted public interest. *Id.*

Todd primarily relies on *Grenier v. Taylor*, 234 Cal. App. 4th 471 (2015). The court in that case stated: "[A] defendant charged with defamation cannot, through his or her own conduct, create a defense by making the claimant a public figure. Otherwise private information is not turned into a matter of public interest simply by its communication to a large number of people." 234 Cal. App.

4th at 482.  Todd asserts that Lovecruft published the Statements as part of the parties' private dispute about Zcash and that under *Grenier*, Lovecruft cannot turn a "private controversy into a public matter by publishing accusations on the internet."  Opp. at 12.

A closer examination of *Grenier* disproves Todd's characterization of the public interest at stake.  In *Grenier*, the plaintiffs were a church pastor and his wife who brought a defamation case against the pastor's stepson and a parishioner.  234 Cal. App. 4th at 476-77.  The defendants had posted multiple comments about the pastor on an internet forum and on the stepson's personal website.  *Id.* at 477.  In these postings, the defendants accused the pastor of childhood abuse against the stepson and claimed that the pastor was stealing money from the church.  *Id.*  The posts included comments stating that the pastor was "a bad guy and has gotten away with a lot of bad stuff in his life including drug dealing, drug smuggling, child abuse, alleged molestation . . . stealing money from the church, spiritual abuse and much other stuff," "a Liar and self-confessed Felony Child Abuser," and "a sick child molesting evil man!"  *Id.*  at 477-78.  On appeal, the plaintiffs argued that these statements were not made in a connection with an issue of public interest because the situation was "a private family dispute that [the defendants] have attempted to make public by their own conduct."  *Id.* at 481.  The court disagreed, stating that the pastor's "character and fitness to serve as a pastor are of interest to the membership" of the church.  *Id.*  It noted that the defendants were "attempting to warn people away from attending the Church with Bob as the pastor," and information provided to aid decision-making by potentially affected parties is an issue of public concern.  *Id.* (citing *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 900 (2004)).  It accordingly held that "allegations of abuse by the members of the clergy and the protection of children concern issues of public interest."  *Id.*

The analysis in *Grenier* is directly applicable to this case.  Todd characterizes Lovecruft's Statements as "pure invective" and lacking in serious analysis of violence against women.  However, as *Grenier* indicates, accusations of abuse on their own can serve the interest of the public at large.  As both parties testify, Todd and Lovecruft are in overlapping professional communities.  Todd states that he is "highly-regarded in the cryptography and cryptocurrency sectors," regularly speaks at conferences around the world regarding his work in cryptography and has a large online

following.  Compl. ¶¶ 1, 16-17, 19.  By his own admission, Todd has influence within the cryptography community and related fields.  Members of those communities have an interest in judging whether they should interact with Todd and allegations of sexual abuse against Todd can inform those decisions.  The court therefore rejects Todd's assertion that accusations alone cannot contribute to a matter of public interest.

*Terry v. Davis Cmty. Church*, 131 Cal. App. 4th 1534 (2005), is also on point.  In that case, the plaintiffs were church youth group leaders who sued their church and various affiliates.  131 Cal. App. 4th at 1539.  The defendants had published a report that accused the plaintiffs of being sexually involved with a minor girl who was a member of the church.  *Id.*  The report was distributed to and read by over 100 people.  *Id.*  The plaintiffs sued for defamation, and the defendants filed an anti-SLAPP motion, which the trial court granted.  *Id.*  On appeal, the plaintiffs asserted that there was no "public interest" in the matter because the issue was a private relationship.  *Id.* at 1547.  The court disagreed:

> The issue as to whether or not an adult who interacts with minors in a church youth program has engaged in an inappropriate relationship with any of the minors is clearly a matter of public interest. The public interest is society's interest in protecting minors from predators, particularly in places such as church programs that are supposed to be safe. It need not be proved that a particular adult is in actuality a sexual predator in order for the matter to be a legitimate subject of discussion.

*Id.*  The court accordingly held that the defendants had shown the existence of a public interest in the issue of the plaintiffs' alleged misconduct.

In this case, Lovecruft made public statements accusing Todd of sexual misconduct toward Lovecruft and at least one other individual.  As in *Terry*, where the court found a public interest in specifically identifying individuals believed to have committed misconduct, Lovecruft's accusations contribute to the discussion surrounding sexual assault because they invite discussion on identifying, responding to, and preventing sexual abuse.  Publicly accusing individuals of rape and sexual assault is unquestionably controversial, but the controversy itself serves to demonstrate that it is a matter of public interest and debate.  This is not to say that such statements are not defamatory; Todd could still prevail on the merits if he meets his burden to show that the statements are false and that Lovecruft made them with the requisite state of mind.  For the purposes of this anti-SLAPP inquiry,

24

however, the public has an interest in identifying individuals who commit sexual abuse and accusations of abuse are matters of public concern.

Todd's argument that this debate is not significant enough to garner public interest is unconvincing.  In *Grenier*, the court of appeals stated that the membership of the church, which ranged from 550 to 1,000, was "large enough to qualify as a 'community' for purposes of section 425.16."  *Grenier*, 234 Cal. App. 4th at 483.  *Terry* found a significant public interest where only about 100 people read the report at issue.  *Terry*, 131 Cal. App. 4th at 1539, 1549.  Here, Todd's complaint and submissions support his claim that he is well-known within his industry.  Both parties maintain active Twitter accounts, and Todd's has over 100,000 followers.  The communities that have an interest in hearing allegations of abuse by Todd are appreciably larger than the relatively small church communities in *Grenier* and *Terry*.  Accordingly, the court finds that the allegedly defamatory statements in this case are of interest to the public.

Finally, to the extent that Todd invites the court to prejudge the truth of the Statements by finding that they are "pure invective," that inquiry is outside the purview of the court's analysis at this stage.  *See Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 969 (N.D. Cal. 2013), *aff'd*, 609 F. App'x 497 (9th Cir. 2015) ("By asserting that the statements are not in the public interest because they are false, plaintiffs urge the Court to 'read a separate proof-of-validity requirement into the operative sections of the statute,' which this Court cannot do." (citation omitted)).

In sum, the court concludes that Lovecruft has met their burden to show that the Statements were made in a public forum in connection with a matter of public interest.

### B.      Probability of Prevailing

On the second step of the anti-SLAPP analysis, the burden shifts to the plaintiff to show a reasonable probability of succeeding on the merits.  "Reasonable probability" in the anti-SLAPP statute requires only a "minimum level of legal sufficiency and triability." *Linder v. Thrifty Oil Co.,* 23 Cal. 4th 429, 438 n. 5 (2000). The second step of the anti-SLAPP inquiry is often called the "minimal merit" prong.  *See Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal. App. 4th 658, 675 (2005); *Navellier v. Sletten*, 29 Cal.4th 82, 93 (2002) ("[T]he

United States District Court
Northern District of California

statute poses no obstacle to suits that possess minimal merit."). To establish "minimal merit," the plaintiff need only "state and substantiate a legally sufficient claim." *Jarrow Formulas, Inc. v. LaMarche,* 31 Cal. 4th 728 (2003); *see Heineke* 2017 WL 6026248, at *4 (stating that the plaintiff's burden is "a relatively low one").

The court's inquiry at this stage "is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." *Baral,* 1 Cal. 5th at 384-85. In determining whether the plaintiff has substantiated a legally sufficient claim, the court looks to the pleadings and affidavits submitted by the parties but "do[es] not weigh credibility [or] evaluate the weight of the evidence." *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 888 (9th Cir. 2016) (quoting *Overstock*, 151 Cal. App. 4th at 699.) Nor does the court resolve "conflicting factual claims." *Baral*, 1 Cal. 5th at 384. It instead "accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." *Id.* at 385. However, the plaintiff must support his claims with admissible evidence. *Metabolife*, 264 F.3d at 840. "[A]verments on information and belief are insufficient." *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 654 (1996), *disapproved of on other grounds by Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53 (2002).

California law provides that a plaintiff bringing a defamation claim must show four elements: "that defendants published the statements; that the statements were about plaintiff; that they were false; and that defendants failed to use reasonable care to determine the truth or falsity." *Hecimovich v. Encinal Sch. Parent Teacher Org.*, 203 Cal. App. 4th 450, 470 (2012). If the plaintiff is a public figure, then he must prove that the defendant acted with "actual malice." *Makaeff*, 715 F.3d at 258. The court first considers whether Todd has made a prima facie case that the Statements constitute defamation, and then turns to whether he has met his burden to show that Lovecruft made the statements with the requisite state of mind.

### 1.     Defamatory Meaning of the Four Statements

Under California law, defamation is "the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Makaeff*, 715 F.3d at 264 (quoting *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 27 (2007)) (further

citations omitted).    The court determines as a matter of law whether a statement is "reasonably susceptible of a defamatory interpretation; if the statement satisfies this requirement, it is for the jury to determine whether a defamatory meaning was in fact conveyed to the listener or reader." *Bently Reserve LP v. Papaliolios*, 218 Cal. App. 4th 418, 428 (2013).    In deciding whether a statement is reasonably susceptible of a defamatory meaning, a court must use "a totality of the circumstances test" and "put itself in place of an average reader and determine the natural and probable effect of the statement." *ZL Techs., Inc. v. Does 1-7*, 13 Cal. App. 5th 603, 624 (2017) (quoting *Bently Reserve LP*, 218 Cal. App. 4th at 427-28).    "[W]e look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication." *Issa v. Applegate*, 31 Cal. App. 5th 689, 703 (2019) (quoting *Forsher v. Bugliosi*, 26 Cal. 3d 792, 803 (1980)).

California law recognizes two types of defamatory statements.    "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face," otherwise known as libel *per se*.    Cal. Civ. Code § 45a.    A statement is libel *per se* if "a defamatory meaning appears from the language itself without the necessity of explanation or the pleading of extrinsic facts." *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 888 (N.D. Cal. 2015) (quoting *Palm Springs Tennis Club v. Rangel*, 73 Cal. App. 4th 1, 15 (1999)).    Defamation *per quod* is defamatory language that is not libelous on its face.    *Id.* Whether a statement constitutes defamation *per se* or defamation *per quod* matters for the issue of damages, which is discussed further below.

### a.    February 5, 2019 Statement

On February 5, 2019, Lovecruft tweeted the following about Kobeissi:

> This is not even touching upon the stories of the rape and assault survivors of you and @petertodd and @ioerror and you have all been seen to behave conveniently alike and seen to dutifully protect one another [upside down smiley face]

Todd Decl., Ex. A ("First Statement").    Lovecruft argues that the First Statement is not defamatory on its face because "it is not clear whether the statement calls Todd a rapist, or an assaulter, or simply references other people's prior allegations of rape and assault against Todd." Mot. at 17.    They also assert that it is not defamation because it was directed at Kobeissi, and not at Todd himself.    *Id.*

Todd responds that the tweet "specifically accuses Peter Todd of rape and sexual assault," and that "[n]o reasonable person would view it as stating or implying anything other than that Todd has raped and sexually assaulted others."  Opp. at 14.

Although the First Statement is primarily directed at Kobeissi, it specifically refers to Todd and Applebaum.  It is reasonable to construe the statement as asserting that all three individuals have committed rape or assault and that there are survivors of that conduct.  This interpretation is "reasonably susceptible of a defamatory meaning" against Todd because it contains a factual assertion that some people have survived rape and/or sexual assault perpetrated by Todd.  It is not material that the First Statement is primarily directed at Kobeissi because it is also reasonably susceptible of a defamatory meaning as to Todd.  Lovecruft's argument that the First Statement is ambiguous as to whether it accuses Todd of rape or of a less serious sexual assault is unavailing, since both interpretations would be defamatory.  *See Yow v. Nat'l Enquirer, Inc.*, 550 F. Supp. 2d 1179, 1183 (E.D. Cal. 2008) ("Statements which falsely impute the commission of a crime are libelous on their face.").

Todd has demonstrated that the First Statement is reasonably susceptible of a defamatory meaning, and therefore has established a prima facie case that the First Statement constitutes defamation *per se.*

### b.      February 8, 2019 Statement

Lovecruft posted another Statement on Twitter on February 8, 2019, which reads:

> i love watching the men in my industry who've sexually abused me and many others squirm as I take them out one by one while they nervously await their turn [¶] hahahahahahahaha eat goat dung you epoxy brained cowards.

Todd Decl., Ex. A ("Second Statement").  Lovecruft contends that nothing in the Second Statement is defamatory against Todd and in fact "does not even mention him—and there is no indication that the statement was referring to him."  Mot. at 16.  Todd responds that the statement is defamatory when taken in context because Lovecruft "expressly accused Todd of rape" in another Twitter post made three days earlier—a reference to the First Statement discussed above.  Opp at 15; Todd Decl. ¶¶ 4, 28, Ex. A.  Todd asserts that due to the proximity and timing of the First Statement, "[a] reasonable person would understand that the subsequent reference to 'men in my industry who've

1    sexually abused me' refers to Todd."  Opp. at 15.

2        Whether the Second Statement constitutes defamation *per se* turns on whether the First

3    Statement is part of the same publication as the Second Statement.  If it is, the court must consider

4    the context of "the publication as a whole."  *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040

5    (9th Cir. 1998).  If the earlier tweet is instead an extrinsic fact, then the Statement is at most

6    defamation *per quod*.  Cal. Civ. Code § 45a.  The Second Restatement of Torts explains the

7    difference between "context" and "extrinsic circumstances."  Rest. 2d Torts § 563.  The context of

8    a statement "includes all parts of the communication that are ordinarily heard or read with it."  *Id.* §

9    563(d).  For example, "the entire contents of a personal letter are considered as the context of any

10   part of it because a recipient of the letter ordinarily reads the entire communication at one time."  *Id.*

11   By contrast, extrinsic circumstances consider "all the circumstances under which [the statement] is

12   made so far as they were known to the recipient."  *Id.* § 563(e).  To illustrate, "an apparently

13   flattering statement may be reasonably understood in a defamatory sense by reason of the

14   publisher's recognizably ironical manner."  *Id.*  The Ninth Circuit has adopted the distinction set

15   forth by the Second Restatement of Torts.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)

16   ("In evaluating the context in which the statement appeared, we must take into account 'all parts of

17   the communication that are ordinarily heard or read with it.'" (quoting Rest. 2d Torts § 563(d)).

18        Here, the First and Second Statements are separate tweets and not part of the same thread.

19   The Second Statement does not retweet or explicitly reference the First Statement.  The temporal

20   proximity of the tweets would not be obvious to an average user unless they specifically looked at

21   Lovecruft's Twitter page.  Lovecruft's followers would ordinarily read the tweets as part of their

22   own feed, along with the tweets of whatever other users they follow and may see many other tweets

23   between the two posts.  Further, although sexual assault is the subject matter of both tweets, it is not

24   obvious that they are both referring to the same individuals.  Looking at the tweets Lovecruft made

25   between those dates, it appears that the primary discussion surrounded Lovecruft's allegations

26   against Kobeissi, not Todd.  Even if a user were following Lovecruft's tweets closely, they may

27   reasonably believe that Lovecruft is referring only to Kobeissi.  For these reasons, the court

28   concludes that the First Statement would not ordinarily be read with the Second Statement, and

United States District Court
Northern District of California

therefore constitutes a fact extrinsic to the later tweet and not merely context.  Accordingly, the Second Statement is not defamation *per se*.  *Barnes-Hind, Inc. v. Superior Court*, 181 Cal. App. 3d 377, 384–85 (1986) (finding that a statement constitutes defamation *per se* only when "a defamatory meaning appears from the language itself without the necessity of explanation or the pleading of extrinsic facts").

However, the Second Statement may constitute defamation *per quod*.  The court determined above that the First Statement could reasonably be read to assert that Todd, Applebaum, and Kobeissi had each committed rape and/or sexual assault.  A reader could infer that Lovecruft's tweet three days later about "men in my industry" refers at least in part to the same group of people.  In addition, the Second Statement explicitly states that those men sexually assaulted Lovecruft and "many others."  Read together with the First Statement, the Second Statement could imply that Todd, among others, sexually assaulted Lovecruft and/or other people.  Therefore, the Second Statement is reasonably susceptible of a defamatory meaning.  Whether that meaning was actually conveyed is a matter of fact for the jury.  *Bently Reserve LP*, 218 Cal. App. 4th at 428 (2013).

Therefore, Todd has made a prima facie case that the Second Statement constitutes defamation *per quod*.

### c.   February 20, 2019 Statements

Lovecruft tweeted two Statements on February 20, 2019.  The first reads:

> Nadim Kobeissi is a serial rapist and abuser who defends other rapists including Jacob Appelbaum and Peter Todd and in 2012 he grabbed my face and force kissed me at a conference and i absolutely believe the multiple survivors i've personally spoken with since then.

Todd Decl., Ex. A ("Third Statement").  This Statement explicitly and unambiguously refers to Todd as a rapist.  Lovecruft does not dispute that the Statement is reasonably susceptible of a defamatory meaning.  If it is false, this Statement constitutes defamation *per se*.

The other February 20, 2019 Statement reads:

> yes, similar to Nadim, i personally have a story about Peter Todd and i've personally spoken with survivors with absolutely awful and horrifying reports who are terrified of him and of coming forward (rightly so) [¶] i however am not afraid and shitty dudes are going down

Todd Decl., Ex. A ("Fourth Statement").  Lovecruft argues that this Statement is not defamatory

United States District Court
Northern District of California

United States District Court
Northern District of California

because "a statement about vague reports and stories are simply too generalized to constitute defamation." Mot. at 16.  In response, Todd again urges the court to examine the Fourth Statement in context and submitted an exhibit that shows that Lovecruft was responding to another user's tweet.  Opp. at 15; Todd Decl., Ex. A.  Another Twitter user asked Lovecruft, "Peter Todd is a rapist?", to which Lovecruft responded "yes . . . ."  Opp. at 15.  Todd argues that viewing the tweets together, Lovecruft's tweet specifically accuses him of being a rapist.  *Id.*

On its own, the Fourth Statement is not susceptible of a defamatory meaning.  It vaguely asserts that Lovecruft has a "story" about Todd without any indication as to the content of the story.  There is also no reference to the content of the "absolutely awful and horrifying reports."  However, reading Lovecruft's tweet together with the question posed by the other user immediately conveys that Lovecruft is accusing Todd of being a rapist.  The other user asked a direct "yes or no" question as to whether Todd is a rapist, to which Lovecruft unambiguously answered "yes."  As explained above, whether the Fourth Statement is defamation *per se* depends on whether the other user's tweet is context for Lovecruft's response.  The court concludes that it is.  Unlike the First and Second Statements considered above, where Lovecruft's tweets were three days apart and not ordinarily read together, the Fourth Statement is a direct response to another user's question.  A user reading the Fourth Statement would have to also read the other user's tweet in order to understand Lovecruft's response.  Accordingly, the two tweets would ordinarily be read together.

Because the third-party tweet provides context for the Fourth Statement and because reading both together unambiguously conveys the accusation that Todd is a rapist, the court concludes that Todd has made a prima facie case that the Fourth Statement is defamation *per se*.

### 2.    State of Mind

Having determined that the four Statements reasonably convey a defamatory meaning, the court turns to the question of whether Todd has made a prima facie case that Lovecruft made each Statement with the requisite state of mind.  A private individual need only show that the defendant did not act with reasonable care "in checking on the truth or falsity of the information before publishing it."  *Carney*, 221 Cal. App. 3d at 1016.  By contrast, people who are considered public figures must prove that the defendant acted with "actual malice," *Makaeff*, 715 F.3d at 258, which

requires a showing that a statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (the "*New York Times*" standard).  An individual may be a public figure for all purposes or only in limited contexts:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.

*Manzari*, 830 F.3d at 888 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)).  The parties do not dispute that Todd is not a general purpose public figure, but Lovecruft argues that he is a limited purpose public figure with respect to the Applebaum controversy specifically and the public debate about sexual assault generally.  The court does not reach the question of whether Todd may be considered a limited purpose public figure.  For the reasons explained below, that issue is irrelevant to the outcome.

As an initial matter, the court agrees with Todd that there are two types of defamatory messages at issue: Lovecruft's statements that Todd sexually assaulted and/or raped someone other than Lovecruft, and Lovecruft's statements that Todd engaged in sexual misconduct toward Lovecruft.  *See* Opp. at 19.  The court separately evaluates the issue of state of mind as to the two kinds of defamatory messages.

### a.      Third Party Accusation

The Statements relay accusations that Todd sexually assaulted and/or raped someone other than Lovecruft.  Lovecruft asserts that they based these Statements on Doe's first-hand account that Todd raped Doe.  Mot. at 14.  Todd argues at length that Lovecruft is not credible because of "their history of routinely and falsely accusing men and women of sexual assault, rape, and other crimes when those men and women do not support Lovecruft's position."  Opp. at 22.  He asserts that Lovecruft had motive to fabricate evidence because of his criticism of Lovecruft's Zcash business. *Id.* at 21.  He also argues that the Doe declaration "was either completely fabricated by Lovecruft or by an accomplice of Lovecruft."  *Id.* at 23.  He contends this fabrication is "evidenced by the fact that the declaration is completely false [because] Todd has never raped or sexually assaulted any

person, let alone under the circumstances described in Jane Doe's declaration." *Id.*

"[T]o meet his burden for the second step of the anti-SLAPP motion analysis, Plaintiff must provide evidence tending to show the factual underpinnings of Defendant's statement are false." *Guzman v. Finch*, 2019 WL 1877184, at *8 (S.D. Cal. Apr. 26, 2019).  Here, Todd must make a prima facie case that Lovecruft's accusations that he raped Doe are false.  He notably says very little about the Doe declaration, which provides the factual underpinnings of Lovecruft's accusations.  He asserts that the declaration is "false" and "fabricated," but he does not support these conclusory statements.  For example, he does not testify that he does not know Doe's real identity; that he does not know anyone with Doe's sleep disorder; that he never met such person in the identified location in May 2017; that he did not go into a hotel room with Doe; or that he did not have sex with her.  Instead, he merely asserts that he "did not rape, assault, or coerce anybody into having sex with me." Todd Decl. ¶ 33.  Todd's evidence, even if taken as true, does not actually contradict Doe's account, it merely does not characterize the alleged encounter as rape.  Since Todd has not presented anything other than unsubstantiated conjecture, he has not made a prima facie case that Doe's account or Lovecruft's subsequent accusations are false.  *See Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1054 (2008) ("[I]f [the defendant's] version of events was inaccurate, plaintiffs could have submitted prima facie evidence of its falsity through the declaration [of the defamatory statement's subject].  Because plaintiffs did not do so, we conclude that plaintiffs failed to carry their burden of making a prima facie showing of falsity.").  Todd has submitted no evidence that the court could credit to conclude that Doe's account is false.  *See Taus v. Loftus*, 40 Cal. 4th 683, 714 (2007) ("Though the court does not weigh the credibility or comparative probative strength of competing evidence, it should grant the motion [to strike] if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.").

Even if Todd provided admissible evidence tending to show that Doe's account is false, which he did not, he also has not met his prima facie burden to establish that Lovecruft negligently relied on Doe's account, let alone that Lovecruft knew Doe's statements were false or acted with reckless disregard as to whether they were false.  He has not submitted any evidence, for example,

that Doe is known to be an unreliable source.[9]  *Cf. Grewal v. Jammu*, 191 Cal. App. 4th 977, 991 (2011) (finding that the plaintiff met his burden to show lack of reasonable care where the defendants relied on a source with a criminal history and reputation for dishonesty).  Todd's complete lack of evidence on this point precludes a finding that he has met his burden with respect to Lovecruft's state of mind.

Todd's arguments about Lovecruft's credibility and motivations are also unconvincing.  As Todd himself points out, the court cannot consider Lovecruft's credibility on an anti-SLAPP motion.  *See* Opp. at 10; *see also Kashian v. Harriman*, 98 Cal. App. 4th 892, 906 (2002) ("[T]he court does not weigh the evidence or make credibility determinations.").  The facts that Todd submitted regarding Lovecruft's alleged history of false accusations are therefore irrelevant.  In addition, Todd raises the Zcash argument to show that Lovecruft had a motive to fabricate the Doe declaration, but as stated above, Todd provides zero evidence that the declaration was actually fabricated.  Todd could easily refute any number of facts within the Doe declaration because those facts would be within his personal knowledge.  He has not done so.  Accordingly, even if Lovecruft had a motivation to lie, motivation alone cannot establish negligence.  *See Carney*, 221 Cal. App. at 1017 ("That a libel defendant acts with hatred or ill will does not automatically establish that the defendant fails to exercise reasonable care in determining whether a communication is untrue.").

In sum, Todd has not made a prima facie showing that Lovecruft failed to use reasonable care in accusing Todd of raping or sexually assaulting someone other than Lovecruft.  As such, he cannot establish the more demanding standard that Lovecruft acted with malice.  It is therefore unnecessary to reach the issue of whether he is a limited public figure who must demonstrate malice.  Since Todd has not met his prima facie burden on this issue, Defendants' motion to strike is granted as to Lovecruft's accusations regarding Todd's sexual misconduct against another person.

### b.    Personal Accusations

Two of the Statements refer to Lovecruft's allegations about Todd's sexual misconduct toward them personally: the Second Statement in which Lovecruft refers to "men in my industry"

---

[9] Note that the court does not make any findings with regard to Doe's credibility but rather illustrates Todd's lack of evidence regarding whether it was reasonable for Lovecruft to rely on Doe's statements.

United States District Court
Northern District of California

and the Fourth Statement where Lovecruft states that "[I] personally have a story about Peter Todd." Lovecruft claims that these Statements are true, citing to Lovecruft's own encounter with Todd in August or September 2015. Todd testifies that Lovecruft's version of that incident is false.

*Heineke* is instructive. In that case, two university students accused a professor of the university of sexually harassing them. 2017 WL 6026248, at *1. The university opened an investigation and issued a report finding that the professor had violated the school's sexual misconduct policy. *Id.* The professor brought a defamation case against the university and one of the students. The court analyzed the question of malice as to the defendant's claim of privilege under California Civil Code § 47(c), which also applies the *New York Times* standard of malice. *See id.* at *11. The plaintiff had testified in his declaration that the defendant student falsely accused him. *Id.* at *10. The court found that defendant's unequivocal denials of the allegations was enough to meet his burden to show malice at the anti-SLAPP stage. *Id.* at *10, *14.

Here, Lovecruft testifies that Todd engaged in sexual misconduct toward them. Todd denies Lovecruft's accusation. The only evidence supporting either parties' claims are their declarations attesting to conflicting versions of their encounter. In conducting the anti-SLAPP analysis, "[t]he court does not weigh evidence or resolve conflicting factual claims." *Baral*, 1 Cal. 5th at 384. It considers only whether the plaintiff has stated "a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." *Id.* at 384-85. As *Heineke* shows, the defendant's testimony that the statements are true is not enough to defeat the plaintiff's claim at this stage. Under the anti-SLAPP analysis, the court must accept Todd's evidence as true; Todd describes his Fall 2015 encounter with Lovecruft in some detail and unequivocally avers that he did not engage in sexual misconduct toward Lovecruft.[10] At this stage, Lovecruft's testimony to the contrary does not defeat Todd's evidentiary submissions. This is because logically, if Lovecruft is lying, Lovecruft would have to know that

---

[10] Unlike Todd's response to the Doe allegations, which consists of conclusory and unsubstantiated statements, Todd's testimony as to Lovecruft's personal allegations provides specific facts that directly contradict Lovecruft's account.

their version of events is false because they personally experienced the encounter.  That in turn would mean that the Statements were made with malice.  *New York Times Co*, 376 U.S. at 280 (stating that malice is established where the defendant made a statement "with knowledge that it was false or with reckless disregard of whether it was false or not").  Since Todd has made a prima facie case that Lovecruft acted with malice, it is irrelevant whether he is a private figure who need only show lack of reasonable care.  *Khawar v. Globe Int'l, Inc.*, 19 Cal. 4th 254, 279 (1998), *as modified* (Dec. 22, 1998) ("[E]vidence that is sufficient to support a finding of actual malice is usually, and perhaps invariably, sufficient also to support a finding of negligence.").

Accordingly, Todd has made a prima facie case that Lovecruft's personal accusations were made with the requisite state of mind.

### C.    Special Damages

Todd met his anti-SLAPP burden with respect to Lovecruft's personal accusations of sexual misconduct.  As the court found above, Todd made a prima facie case that the Fourth Statement constitutes defamation *per se* as to Lovecruft's personal accusation against him.  However, the court found that the Second Statement at most constitutes defamation *per quod*.[11]  In addition to the other elements of a defamation claim, a claim for defamation *per quod* requires a plaintiff to plead special damages.  These include "all damages that plaintiff alleges and proves that he or she has suffered in respect to his or her property, business, trade, profession, or occupation, including the amounts of money the plaintiff alleges and proves he or she has expended as a result of the alleged libel, and no other." Cal. Civ. Code § 48a.  "[S]pecial damages are defined narrowly to encompass only economic loss." *Gomes v. Fried*, 136 Cal. App. 3d 924, 939 (Ct. App. 1982).  In California, "special damages must be pled and proved precisely."  *Id.*; *cf.* Fed. R. Civ. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated.")   "A general allegation of the loss of a prospective employment, sale, or profit will not suffice."  *Pridonoff v. Balokovich*, 36 Cal. 2d 788, 792, 228 P.2d 6, 8 (1951).

Lovecruft contends that Todd has not pleaded or proved special damages for defamation *per*

---

[11] Again, the court decides here whether the Statements are reasonably susceptible of a defamatory meaning, while the jury decides whether the meaning was actually conveyed.  *Bently Reserve LP*, 218 Cal. App. 4th at 428.

*quod* with the requisite particularity.  Mot. at 18.  Todd does not respond to this argument.  The only apparent reference in the complaint to special damages is paragraph 60, which states "on information and believe Todd has lost professional opportunities, including conference speakerships, because of Defendant's Statements."  Compl. ¶ 60.  This statement is perfunctory and vague and does not meet the standard for pleading and proving special damages "precisely."  The court in *Martin v. Wells Fargo Bank*, No. 17-cv-03425-RGK, 2018 WL 6333688 (C.D. Cal. Jan. 18, 2018) dismissed a claim for defamation *per quod* where the plaintiff alleged damages in the form of "[a] lowered credit score, . . . raised interest rates, loss of business opportunity, inability to get a home loan, inability to get a car, inability to have credit cards, [and] inability to raise his limits on other credit cards he possesses."  2018 WL 6333688, at *2.  *Martin* stated that the plaintiff failed to allege special damages with the requisite particularity because "[h]e provides no estimation of the pecuniary loss suffered, and the opportunities allegedly lost are impermissibly vague."  *Id.*; *see also Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1047 (C.D. Cal. 1998) (finding as insufficient allegations that the plaintiff "has suffered and continues to suffer special damages from the loss of revenue from wholesale and retail sales").  Todd's vague reference to "lost professional opportunities, including conference speakerships" is not sufficient to meet the heightened pleading standard for special damages.  Nor does Todd submit any evidence of special damages with his opposition or make any argument on that issue.  Accordingly, Todd has not established a prima facie case that he is entitled to special damages for Lovecruft's Second Statement.  However, since Lovecruft's personal accusation in their Fourth Statement is defamation *per se*, Todd need not show special damages as to that Statement.  *Clark v. Hidden Valley Lake Ass'n*, No. 16-cv-02009-SI, 2018 WL 3069285, at *6 (N.D. Cal. Apr. 18, 2018) ("Under California law, defamation per se does not require proof of actual damages but instead presumes that the plaintiff has suffered such damages.").

In sum, the motion to strike is granted with respect to all four Statements to the extent that they implicate sexual misconduct by Todd upon anyone other than Lovecruft.  By contrast, Todd has met his prima facie burden with respect to the Second and Fourth Statements to the extent they accuse Todd of sexual misconduct toward Lovecruft.  However, Todd has not made a prima facie case that he is entitled to special damages with respect to the potential defamation *per quod* in the

Second Statement, so the motion to strike is granted as to the Second Statement.  Since Todd is not required to show special damages for the Fourth Statement, his defamation case may move forward insofar as it challenges the portion of the Fourth Statement that accuses Todd of sexual misconduct against Lovecruft.

## V.    LEAVE TO AMEND

As set forth above, Lovecruft's motion to strike is granted except as to the Fourth Statement, and only to the extent it may be read as accusing Todd of sexual misconduct against Lovecruft. Although Todd has not requested leave to amend the complaint, the court considers whether it is appropriate to grant Todd such relief.  After thorough consideration and review of the relevant authorities, the court holds that it is not.

Under Federal Rule of Civil Procedure 15(a), leave to amend should be granted as a matter of course, at least until the defendant files a responsive pleading.  Fed. R. Civ. P. 15(a)(1).  After that point, Rule 15(a) provides generally that leave to amend the pleadings before trial should be given "freely . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "This policy is to be applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir. 2003) (quotation omitted).  In the absence of an "apparent" reason, such as undue delay, bad faith or dilatory motive, prejudice to the opposing party, futility of the amendments, or repeated failure to cure deficiencies in the complaint by prior amendment, it is an abuse of discretion for a district court to refuse to grant leave to amend a complaint.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Lockheed Martin Corp. v. Network Sols., Inc*., 194 F.3d 980, 986 (9th Cir. 1999).  These factors do not "merit equal weight," and "it is the consideration of prejudice to the opposing party that carries the greatest weight."  *Eminence Capital*, 316 F.3d at 1052.

After *Planned Parenthood*, courts have generally granted leave to amend after ruling on an anti-SLAPP motion based on legal challenges.  *See, e.g.*, *Tensor Law P.C*, 2019 WL 3249595, at *13 (granting leave to amend on a "purely legal" anti-SLAPP motion); *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, No. 18-cv-07579-WHO, 2019 WL 1995768, at *3 (N.D. Cal. May 6, 2019) (same); *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 2019 WL 4747671, at *10 (S.D. Cal. Sept. 27, 2019) (same).  No post-*Planned Parenthood* case has considered whether a plaintiff should be granted

United States District Court
Northern District of California

leave to amend after losing an anti-SLAPP motion based on factual challenges, which "must be treated as though it were a motion for summary judgment." *See Planned Parenthood*, 890 F.3d at 833. While amendments under Rule 15(a)(2) "may be made at any stage of the litigation," a court "ordinarily will be reluctant to allow leave to amend to a party against whom summary judgment has been entered . . . ." *Nguyen v. United States*, 792 F.2d 1500, 1503 (9th Cir. 1986) (quotations omitted). *Nguyen* explains why amendment following summary judgment does not typically favor granting leave to amend:

> Much of the value of summary judgment procedure in the cases for which it is appropriate . . . would be dissipated if a party were free to rely on one theory in an attempt to defeat a motion for summary judgment and then, should that theory prove unsound, come back long thereafter and fight on the basis of some other theory.

*Id.* (quoting *Freeman v. Continental Gin Co.*, 381 F.2d 459, 469-70 (5th Cir. 1967)). As discussed above, the current motion is not identical to a Rule 56 motion because it requires the plaintiff to show a "reasonable probability" of success on the merits, not just a triable issue of material fact. But the considerations examined in *Nguyen* apply here. Anti-SLAPP motions based on factual challenges are a hybrid of a Rule 56 motion and a special motion to strike under section 425.16. Under *Nguyen*, leave to amend is not favored after a Rule 56 motion, and under established California law, is not permitted after an anti-SLAPP motion. *See Martin v. Inland Empire Utilities Agency*, 198 Cal. App. 4th 611, 629 (2011) ("Section 425.16 provides no mechanism for granting anti-SLAPP motions *with leave to amend*."). It would be a strange result to apply a procedure to a hybrid motion that generally does not apply to either predicate motion.

In addition, *Foman* explains that the purpose of the liberal approach to amendment in federal court is because a plaintiff "ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 at 182; *see also Eldridge v. Block*, 832 F.2d 1132, 1135 (9th Cir. 1987) ("In exercising its discretion with regard to the amendment of pleadings, 'a court must be guided by the underlying purpose of Rule 15—to facilitate decision on the merits rather than on the pleadings or technicalities.'") (quoting *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981)). In this case, the court, at the request of the parties, went beyond review of the pleadings and has carefully considered all the evidence submitted by Todd in support of his opposition. Both parties voluntarily

waived the right to seek further discovery and Todd has not made any request for leave to amend if the court were to grant Lovecruft's motion.  The court's decision is not based "on the pleadings or technicalities" but rather on a thorough review of the current evidentiary record, the parties' arguments, and the parties' explicit waiver of discovery.  Accordingly, the purpose of Rule 15(a)(2) is not furthered by granting leave to amend at this stage.

*Verizon* does not mandate a different result.  *See Verizon*, 377 F.3d at 1091 ("[G]ranting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment.").  *Verizon* was decided before *Planned Parenthood* and did not consider the dual framework laid out by that opinion.  Under *Planned Parenthood*, if an anti-SLAPP motion is based on "purely legal arguments, then the analysis is made under [Rule] 8 and 12 standards," in which case the liberal amendment standards of Rule 15(a)(2) apply.  *See Planned Parenthood*, 890 F.3d at 833.  But if the motion raises a factual challenge, "then the motion must be treated as though it were a motion for summary judgment," *id.*, the value of which is undermined by permitting free amendment of the pleadings.  *See Nguyen*, 792 F.2d at 1503.

Accordingly, the identified portions of Todd's complaint are stricken without leave to amend.

## VI.   CONCLUSION

For the foregoing reasons, Lovecruft's motion to strike is granted as to all four Statements to the extent they implicate Lovecruft's accusations that Todd engaged in sexual misconduct against someone other than Lovecruft, and as to the Second Statement to the extent it involves Lovecruft's personal accusation against Todd.  The motion is denied as to Lovecruft's personal accusation against Todd in the Fourth Statement.

**IT IS SO ORDERED.**

Dated: January 6, 2020



Donna M. Ryu
Judge Donna M. Ryu
United States Magistrate Judge

40